**LOUISIANA FARMERS' PROTECTIVE UNION, Inc., v. GREAT ATLANTIC & PACIFIC TEA CO. OF AMERICA, Inc., et al.**

No. 126.

District Court, E. D. Arkansas, W. D.

Sept. 23, 1941.

898

James H. Morrison, of Hammond, La., Cameron C. McCann, Rene Waguespack, Edward R. Schowalter, all of New Orleans, La., K. K. Kennedy, of Baton Rouge, La., Joseph A. Sims, of Hammond, La., and Taylor & Eichenbaum, Beloit Taylor, and E. Chas. Eichenbaum, all of Little Rock, Ark., for plaintiff.

Frost & Jacobs and Logan Morrill, all of Cincinnati, Ohio, Monroe & Lemann and J. Raburn Monroe, all of New Orleans, La., and Owens, Ehrman & McHaney, Grover T. Owens, and S. Lasker Ehrman, all of Little Rock, Ark., for defendant Great Atlantic & Pacific Tea Co. of America, Inc., and others.

Clark & Rice, William H. Clark, Jr., and Russell V. Rogers, Jr., all of Dallas, Tex., Monroe & Lemann and J. Raburn Monroe, all of New Orleans, La., and House, Moses & Holmes, Jos. W. House, and Denham Wooten, all of Little Rock, Ark., for defendant Safeway Stores, Inc., and another.

LEMLEY, District Judge.

This is an action for treble damages under Title 15, Section 15 of the United States Code Annotated, which provides as follows: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

The suit was originally brought as a class action by the Louisiana Farmers' Protective Union, Inc., and one Ellis M. Jenkins, an alleged member of said association, as plaintiffs, against the Great Atlantic & Pacific Tea Company of America, Inc., Atlantic Commission Company, Inc., Kroger Grocery & Baking Co., Inc., Wesco Food Co., Inc., Safeway Stores, Inc., and Tri-Way Produce Co., Inc., defendants.

The plaintiffs in their original complaint alleged that the Louisiana Farmers' Protective Union, Inc., was a non-profit cooperative corporation, organized under the laws of the State of Louisiana, and com-

posed of each and every strawberry grower in the State of Louisiana who ships strawberries in interstate commerce, and that the plaintiff Ellis M. Jenkins was a member, and the president, of said association and joined in the complaint "individually for himself, and representing all other members" of the association similarly situated; that the defendants were justly indebted unto "your petitioner" jointly, severally, and in solido in the sum of $8,328,576, together with interest thereon; that the right sought to be enforced on behalf of said association was "a several right," and that there was a common question of law or fact affecting "the several rights," and that the persons constituting the class were so numerous (upwards of eight thousand) as to make it impracticable to bring them all into court; that during the 1937 season "your petitioner through its members, the strawberry farmers of Louisiana," shipped in interstate commerce 3,400 cars of strawberries, for which said members received an average of $1.57 per crate, and that during the season of 1938 2,500 cars were shipped, for which an average price of $1.97 per crate was received; and that the defendants, in the years 1937 and 1938, handled approximately 25% of "petitioner's" strawberries at retail through their stores operated throughout the United States.

Following these allegations, an attempt was made in the original complaint to allege a violation of the Robinson-Patman Act, the charge being that in the years 1937 and 1938 "the defendants did unlawfully sell petitioner's strawberries in interstate commerce at prices below cost for the sole purpose of destroying competitors and eliminating competition in an attempt to create a monopoly."

It was further alleged in the original complaint that approximately 75% of the strawberries of Louisiana are sold at retail by independent or small groceries or food stores, and that the defendants through their vast holdings, ability to advertise, etc., "have sold your petitioner's commodity for the sole purpose of stifling competition, not only in fresh fruits, such as strawberries, but are attempting to create a monopoly unto themselves for the exclusive distribution of all agricultural and food-stuff commodities at retail in the continental United States."

It was further alleged that, whereas in 1937 the strawberry farmers of Louisiana actually received gross $3,928,768, or $1.57 per crate, for 2,502,400 crates of strawberries shipped, they would have received $6,005,760, or an average of $2.40 per crate, had it not been for the alleged illegal acts of the defendants, making a net loss of $2,076,992 on the 1937 crop; and that, whereas said farmers in 1938 received gross $3,624,800, or $1.97 per crate, for their berries, that had it not been for said alleged illegal acts of the defendants, they would have received $4,324,000 for their berries, making a net loss of $699,200 on the 1938 crop; and it was further alleged that the loss thus sustained "resulted from the illegal acts of the defendants herein, in selling strawberries as 'loss leaders' for the purpose of eliminating competition and attempting to create a monopoly." Judgment was asked for the sum total of the alleged damages suffered in the years 1937 and 1938, trebled, plus interest and costs.

The Wesco Food Co., Inc., moved to quash service, which motion was sustained, and it passed out of the case. Motions for a bill of particulars, to strike, to sever, and to dismiss, addressed to the original complaint, were filed by the several remaining defendants, and extensive briefs were submitted by the defendants on said motions. The motions were set down for hearing on oral argument, but, on the day set for the hearing, the plaintiff, Louisiana Farmers' Protective Union, Inc., filed an amended complaint in which its co-plaintiff, Ellis M. Jenkins, was dropped as a party plaintiff.

The amended complaint in question sets up three alleged causes of action, in separate counts, the first based upon the Sherman Anti-Trust Act, U.S.Code Annotated, Title 15, Sections 1 and 2; the second, upon the Clayton Act, Title 15, Section 13; and the third, upon the Robinson-Patman Price Discrimination Act, Title 15, Section 13a.

In the amended complaint the plaintiff, Louisiana Farmers' Protective Union, Inc., alleges, generally, that it is a non-profit cooperative corporation, organized under the laws of the State of Louisiana, and composed of each and every strawberry grower in the State of Louisiana who ships strawberries in interstate commerce, and functions as the marketing agent for its members in the marketing and distribution of strawberries; "that each and every member" of the plaintiff association "has duly assigned" to it "all their right, title, and interest in and to all the damages to

their business which they have sustained through and by the unlawful acts of the defendants" as set forth in the complaint; that the defendants are engaged in the retail grocery business as the owners and operators of retail stores located throughout the United States, certain of the defendants being buying subsidiaries of others; that the defendant, A. & P., owns, operates, and controls retail chain stores to the number of 13,300 in 35 states; that the defendant, Kroger, has a chain of 3,990 retail stores in the United States; and the defendant, Safeway, a chain of over 3,020 stores in the United States; that the defendants, "through their retail food stores, under their proper names as shown" in the complaint, "and operating under various other names, but which are wholly controlled and dominated by the defendants, handled in the years 1937 and 1938 approximately 25% of plaintiff's strawberries at retail through their stores operated throughout the United States."

Following these allegations, an alleged violation of the Sherman Act is charged, in count one of the amended complaint, as follows:

"That in the years 1937 and 1938 the defendants combined and conspired with the object and intent of stifling competition and monopolizing retail distribution of food products in the United States, particularly strawberries; that in pursuance of said plan the defendants have employed the merchandising technique of using 'loss leaders' of certain products, and more particularly in plaintiff's strawberries, to destroy the business of competitors and in that way control the sole outlet for strawberries and other food products; that the result of said conspiracy was to permit said defendants to dictate not only the prices to be paid by them for plaintiff's strawberries but to create a monopoly unto themselves for the exclusive distribution of all strawberries and agricultural and foodstuff commodities at retail in the United States; that a further result of said conspiracy was to enable the defendants to control the retail distribution of food products, and more particularly strawberries, in such a manner as would vest the defendants as the owners of their various retail outlets with arbitrary power to dictate prices not only to the ultimate consumer but to the producer as well."

The amended complaint then charges, in count two, an alleged violation of the Clayton Act, as follows:

"That the defendants have resorted to the merchandising technique of using 'loss leaders' of certain products, and more particularly in the plaintiff's strawberries, with the object and intent of destroying competition, and in that way control the sole outlet for strawberries and other food products; that the use of strawberries as 'loss leaders' by the defendants resulted in a price depreciation of the entire strawberry market and an elimination of competition in the strawberry field; that the defendant corporations having purchased from the plaintiff's members the strawberries * * * mentioned in this complaint, and the said defendants being so engaged in commerce throughout the United States of America, and in the sale of said strawberries therein, and in the course of such commerce, discriminated in price and caused a discrimination in price between the different purchasers of said strawberries throughout the United States of America who purchased from retail stores throughout the United States and in stores other than the retail stores so conducted, owned, operated and controlled by the defendants, which strawberries were sold for use, consumption and resale within the United States, and in places under the jurisdiction of the United States, and the effect of such discrimination was to substantially eliminate competition and tended to create a monopoly in the sale of strawberries; that after the said defendants so purchased and caused to be purchased in their behalf, the said strawberries from the plaintiff's members, it caused the said strawberries to be sold at a price below the purchase price thereof, and discriminated against the purchasers of other and independent retail stores throughout the United States of America, which said other retail stores, independent of the control and domination of the defendants, were unable to meet the unfair, unlawful, and sacrificial prices below cost, at which the defendants caused the said strawberries to be so sold in their retail stores, and that the effect of this discrimination substantially lessened the competition in the sale of strawberries and tended to create a monopoly over the said strawberry industry and over the products of the plaintiff."

An alleged violation of the Robinson-Patman Act is then charged, in count three of the amended complaint, as follows:

"That the defendants herein have resorted to the merchandising technique of using

'loss leaders' as a means of price discrimination in certain products, and more particularly in the plaintiff's strawberries, with the object and intent of destroying competition and in that way controlling the sole outlet for plaintiff's strawberries; that the defendants thereafter sold plaintiff's members' strawberries and contracted to sell plaintiff's members' strawberries at unreasonably low prices, and below the purchase price, for the purpose of destroying competition and eliminating competitors in the various parts of the United States, and practically throughout the United States."

In connection with the alleged violations of the Sherman, Clayton, and Robinson-Patman Acts, it is alleged separately in each instance:

"That during the season of 1937, beginning the latter part of the month of March and ending in the latter part of the month of May, the plaintiff, through its members, the strawberry farmers of Louisiana, shipped in interstate commerce 3,400 cars of strawberries, or 2,502,400 crates of strawberries, for which the plaintiff's members received an average of $1.57 per crate; that had it not been for the illegal acts of the defendants herein, the plaintiff through its members, the strawberry farmers of Louisiana, would have received $6,005,760.-00 for their strawberries, or an average of $2.40 per crate, making a net loss to the plaintiff, through its members, the strawberry farmers of Louisiana, of $2,076,992.-00, on the crop of 1937, due solely to the illegal acts of the defendants herein;" and

"That during the season of 1938 * * *, the plaintiff, through its members, * * * shipped in interstate commerce 2,500 cars of strawberries, or 1,840,000 crates of strawberries, for which the plaintiff's members received an average of $1.97 per crate; that had it not been for the illegal acts of the defendants herein, the plaintiff, through its members, * * * would have received $4,324,000.00 for their strawberries, or an average of $2.35 per crate, making a total loss to the strawberry farmers of Louisiana of $699,200.00 on the crop of 1938, due solely to the illegal acts of the defendants herein."; and

"That plaintiff's entire loss and damage was caused solely by the defendants' wrongful and unlawful acts as hereinbefore alleged."

It is then alleged that, under the Act of October 15, 1914, 15 U.S.C.A. § 15, the plaintiff is entitled to recover three times the actual damage of $2,776,192; and judgment is prayed in the amount of $8,328,576, together with interest thereon, and costs, including a reasonable attorney's fee.

Motions for a bill of particulars and a more definite statement, addressed to the amended complaint, were filed by the several defendants, and were granted in part. Our memorandum opinion in this connection is reported in 31 F.Supp. page 483.

Following the entry of the order made in accordance with the opinion on said motions, the plaintiff filed a bill of particulars herein, which bill of particulars, in response to motions made by the defendants, has been amplified by three amendments.

In its bill of particulars the plaintiff gives the names and addresses of its assignors, 8,795 in number, and sets up that the assignments were oral, and were all made at the same time and place, viz., on March 3rd, 1939, at a meeting of the plaintiff union, held in Hammond, Louisiana. It states that the assignments were effected by the adoption of a motion in the form of a resolution, made by one of the members and seconded by another, a vote being taken thereon, at which time "it was then asked if any one opposed said resolution, and upon no hands being raised it was adopted unanimously." It further sets up that at said meeting all of its said assignors, the same being all of its members, were present and voted in favor of said resolution. In the bill of particulars the term "loss leaders" is defined as follows:

"By the term 'Loss Leaders' is meant an advertising and selling method and technique used by some retail chain-stores and used by the defendants in this case, whereby they offer for sale specific commodities, in this case, strawberries, not at a normal, reasonable or usual profit, not where the reduced price is due to deterioration or perishability of the goods, nor due to obsolescence, and at a reduced price not competitively required, but in fact at cost and even below cost, and at the same time stressing by advertising the sale thereof as an attraction and inducement to bring the customers into the store, not with the idea of making any profitable transaction out of these commodities, or in this case of the strawberries, but seeking thereby to give the impression that these stores or these defendants have a general low priced policy."

The plaintiff has also furnished a copy of its charter, from which it appears that it was incorporated on July 13th, 1937, under the laws of the State of Louisiana; that its object is to organize the farmers of that state into one group "in an effort to materially reduce the cost of production of their crops and to cooperate in securing for them the highest possible price for their crops," and particularly with respect to the strawberry crop. The corporation was given the power to contract, to sue and be sued, and to acquire real and personal property by gift or otherwise, the same to be employed and disposed of in furtherance of the objects and purposes of the corporation. The charter further provides that every farmer who is a resident of the State of Louisiana, and who is a farmer by occupation or profession, and "who has been farming for the past year or more," shall be eligible for membership, and by paying the sum of $1 shall become enrolled as a member for one year; and at the expiration of the first year each member is required to pay annually the sum of $1.

In an amendment to the bill of particulars it is set up that there is a further provision of the constitution of said association providing that "The Board of Directors shall also have the power to protect and represent legally or in the courts every member of said organization in the bringing of class actions, or individual actions, or in the bringing of an action for and on behalf of all the members of said organization by said organization, either by assignment oral or written, assigning whatever right said members may have or otherwise."

It is also set up in said bill of particulars that the plaintiff will contend at the trial that the A. & P. sold Louisiana strawberries as "loss leaders" in 20 specifically designated cities in the United States during the year 1937, and in 23 such cities during the year 1938; that Kroger sold said strawberries as "loss leaders" in 16 designated cities in 1937, and in 19 in 1938; and that Safeway sold such strawberries as "loss leaders" in 11 designated cities in 1937, and in the same cities in 1938. The names of the alleged conspirators are given in some instances, and in other instances it is stated that the officers of certain designated defendants were the conspirators.

To the amended complaint, as supplemented by the bill of particulars and amendments thereto, the remaining defendants have addressed motions to dismiss on the ground that said amended complaint, as supplemented, fails to state a claim upon which relief can be granted to the plaintiff; and this cause comes on for hearing upon said motions, and is submitted to the court on written briefs and oral argument.

The defendants contend that the amended complaint is defective in several respects: that in each count the plaintiff has merely charged a violation of the applicable statute in the general language of the act, and has failed to allege facts sufficient to constitute a violation of the law by the defendants, and has also failed to allege facts showing damage to the business or property of its assignors proximately resulting from the alleged illegal acts of the defendants; that the plaintiff has not alleged compliance with specific requirements of Louisiana law necessary to enable it to maintain this suit as assignee; and that with particular reference to the alleged violation of Section 3 of the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13a, that said section is not an amendment to the Clayton Act, and is not one of the Anti-Trust laws within the meaning of § 1 of the Clayton Act, 15 U.S.C.A. § 12, but is a separate criminal statute, and that Section 4 of the Clayton Act, 15 U.S.C.A. § 15, providing for civil actions for treble damages for violation of the Anti-Trust laws, does not apply thereto; and, further, that said Section 3, insofar as it prohibits sales at "unreasonably low prices," is void for uncertainty.

While a number of most interesting questions are raised by these contentions, the conclusion we have reached renders it unnecessary for us to pass upon them all.

As stated, this is an action for treble damages under Title 15, Section 15 of the United States Code Annotated, providing that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

This statute, providing as it does for treble damages, should be strictly construed. American Banana Co. v. United Fruit Co., C.C., 153 F. 943; La Chappelle v. United Shoe Machinery Corp., D.C., 13 F.Supp. 939.

The courts in applying this statute have laid down a rule which had been variously stated as follows:

In Glenn Coal Co. v. Dickinson Fuel Co. et al., 4 Cir., 72 F.2d 885, 887:

"To recover, the plaintiff must establish two things: (1) A violation of the Anti-Trust Act and (2) damages to the plaintiff proximately resulting from the acts of the defendant which constitute a violation of the Act. In a civil suit under this section, the gist of the action is not merely the unlawful conspiracy or monopolization or attempt to monopolize interstate commerce in the particular subject matter, but is damage to the individual plaintiff resulting proximately from the acts of the defendant which constitute a violation of the law. A mere conspiracy with intent to violate the law while it may be the basis of a valid indictment under the criminal sanction of the Anti-Trust Act, does not give rise to a personal civil suit for damages.

"Thus it has been held in numerous federal decisions that in a civil suit under this special Act the declaration must allege facts from which the court can determine that there has been a violation of the Act with resultant damage proximately caused thereby to the plaintiff. In Alexander Milburn Co. v. Union Carbide & Carbon Corp. [4 Cir.] 15 F.2d 678, 680 (certiorari denied, 273 U.S. 757, 47 S.Ct. 459, 71 L.Ed. 876) this Court, by Judge Parker, said:

" 'For it is not sufficient that the declaration be framed in the words of the statute, or that it allege mere conclusions of the pleader. It must describe with definiteness and certainty the combination or conspiracy relied on, as well as the acts done which resulted in damage to plaintiff,' " etc.;

In Foster & Kleiser Co. v. Special Site Sign Co., 9 Cir., 85 F.2d 742, 750, 751: "In a civil action for damages sustained because of a conspiracy in restraint of trade, the right of recovery is not based upon the conspiracy, but upon the injuries resulting therefrom. The fact that there may be a criminal conspiracy does not give a plaintiff an action for damages under section 7 of the Anti-Trust law, 15 U.S.C.A. § 15 note, supra. Glenn Coal Co. v. Dickinson Fuel Co. [4 Cir.] 72 F.2d 885; Strout v. United Shoe Machinery Co. (D. C.) 208 F. 646, 651. The gist of the action under this section is for injuries inflicted pursuant to the conspiracy for which the wrongdoer is liable. Morris & Co. v. National Ass'n of Stationers [7 Cir.] 40 F.2d 620.";

And on page 754 of 85 F.2d: "In the absence of an allegation of the causal connection between the damage, and the conspiracy to restrict interstate commerce in posters, no cause of action is stated under the Sherman Anti-Trust Act.";

In Hart v. B. F. Keith Vaudeville Exchange et al., 2 Cir., 12 F.2d 341, 345, 47 A.L.R. 775: "The right to recover damages under the Sherman Act requires proof of an injury to the business or property of the person or corporation suing 'by reason of anything forbidden or declared to be unlawful by this act.' The plaintiff who seeks recovery must bear the burden of proof, not only that there was an attempt or actual monopolization or a combine or conspiracy in violation of the anti-trust law, but it must be shown that there was injury to him as a proximate result. Jack v. Armour & Co. [8 Cir.] 291 F. 741; Rice v. Standard Oil Co. (C.C.) 134 F. 464.";

In Rice v. Standard Oil Co., C.C., 134 F. 464, 465: "It is apparent that mere proof that the defendant has entered into a contract or engaged in a combination or conspiracy in restraint of trade or commerce among the several states will not be sufficient to support a cause of action under the seventh section, for there must, in addition thereto, be proof that the plaintiff has, by reason thereof, sustained damage. In his declaration, therefore, the plaintiff must aver not only facts showing such a contract or combination or conspiracy as is declared by the act to be unlawful, but facts showing that by reason of such unlawful thing he has been injured in his business or property.";

In Twin Ports Oil Co. v. Pure Oil Co., 8 Cir., 119 F.2d 747, 751: "The mere fact that the existence of a conspiracy to raise prices is established is not sufficient ipso facto, to support a judgment for damages under the Sherman Act. This statute differs materially in its provisions from those of the Interstate Commerce Act which insure definite and specific recoveries for departures from published tariffs, and from payments of unreasonable and discriminatory freight rates. It is to be noted that here a recovery is sought for triple damages, a privilege that immediate-

ly suggests necessary definiteness in the basis of damages as attributable to the violation of the Federal Act.";

In Noyes v. Parsons et al., 9 Cir., 245 F. 689, 694: "If it appears from the complaint, and is proven, that the plaintiff has been so injured, the court has jurisdiction, and upon the verdict of a jury is required to award the damages provided in the act. But if, on the other hand, he has not been so injured, or if he has been injured, but not by reason of anything forbidden or declared to be unlawful by the act, he cannot recover in the action.";

And on pages 696, 697 of 245 F.: "The argument that the injuries suffered by the Washington Company grew out of the unlawful combination of the defendants in restraint of trade and commerce is not convincing, and the jurisdiction of a federal court, limited as it is by law, cannot be made to depend upon argument. The jurisdiction must not be a matter of mere inference, but must appear by distinct averments according to the rules of good pleading. Minnesota v. Northern Securities Co., 194 U.S. 48, 65, 24 S.Ct. 598, 48 L. Ed. 870, and Hull v. Burr, 234 U.S. 712, 720, 34 S.Ct. 892, 58 L.Ed. 1557.";

In Gerli v. Silk Ass'n of America et al., D.C., 36 F.2d 959, 960: "In terms, the statute (15 U.S.C.A. § 15) gives a right of action to one who has been 'injured in his business or property.' Keogh v. Chicago & N. W. R. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183. In order to state a cause of action, plaintiff must therefore show by appropriate allegation that he has been injured in his business or property. It is not enough to allege something forbidden by the Anti-Trust Laws (15 U.S.C.A. §§ 1–7, 15 [note]) and to claim general damage resulting therefrom. (American Sea Green Slate Co. v. O'Halloran [2 Cir.] 229 F. 77, 79), but the complaint asserting a statutory cause of action must affirmatively show the nature and character of the injury suffered, and that it was an injury to the plaintiff's business or property within the meaning of the statute. Noyes v. Parsons [9 Cir.] 245 F. 689; Jack v. Armour & Co. [8 Cir.] 291 F. 741; Alexander Milburn Co. v. Union Carbide & Carbon Corp. [4 Cir.] 15 F.2d 678.";

In Keogh v. Chicago & Northwestern Railway Company et al., 260 U.S. 156, 164, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183: "Under section 7 of the Anti-Trust Act, as under section 8 of the Act to Regulate Commerce (Pennsylvania R. R. Co. v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas.1915A, 315), recovery cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted. These damages must be proved by facts from which their existence is logically and legally inferable. They cannot be supplied by conjecture.";

In Ebeling v. Foster & Kleiser Co. et al., D.C., 12 F.Supp. 489, 491: "The wrongful act must be specific and the natural and probable effect of the combination and conduct with relation to plaintiff's business, and this must be facts directly related to the defendants' conduct from which damages are logically and legally inferable and not merely conjecture; and must be by the exercise of existing power, not merely that the power existed. Buckeye Powder Co. v. E. I. DuPont de Nemours Powder Co., 248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123.";

In American Sea Green Slate Co. et al. v. O'Halloran et al., 2 Cir., 229 F. 77, 79: "To recover under the seventh section plaintiffs must show that, as a result of defendants' acts, actual damages were sustained—damages in some amount which is susceptible of expression in figures. These damages must be proved by facts from which their existence is logically and legally inferable—not by conjectures, or estimates. They must not be speculative, remote, or uncertain. As we understand the law, a jury may not merely guess that plaintiff lost $1,000 or $10,000 which they might have made, even if they feel reasonably sure that some loss was sustained. They cannot award damage as they do for pain or suffering in an action for personal injuries, or for reputation as they do in a libel suit.";

In H. E. Miller Oil Co. v. Socony-Vacuum Oil Co., Inc., et al., D.C., 37 F. Supp. 831: "While the allegations of the complaint sufficiently charge the conspiracy, and the overt act of actually increasing the price of gasoline, it does not necessarily follow from plaintiff's allegation that it purchased gasoline at artificially maintained high prices that plaintiff's business as a jobber suffered. The situation now presented is not comparable to a personal injury case where the mere allegation of personal injury necessarily implies some pecuniary damage.";

In Jack v. Armour & Co. et al., 8 Cir., 291 F. 741, 745: "But before a recovery can be had by a mere private person under this section, there must at least be an allegation of the manner, nature, extent, or amount of the injury sustained by such private person. The question whether the United States could sue upon such a showing as here made is not involved and is neither important nor decisive, and the cases cited by plaintiff are not in point. If plaintiff may sue for $75,000, and recover such sum, or even any respectable modicum thereof, simply because he happens to be engaged in raising, buying, and selling live stock, it would necessarily follow that every person in the United States engaged in a business similar to plaintiff could likewise sue and recover an equal sum. Obviously the mere statement of the proposition discloses its unsoundness. On both reason and authority, no one can maintain an action under the provisions of section 7 of the Sherman Anti-Trust Act, unless he has suffered an injury in his business or property by proximate reason of the violation by the defendant or defendants whom he sues, of some of the prohibitions contained in that act; for this is what the act says in plain and simple language. It is needless to say that it has been so construed by the courts. Locker v. American Tob. Co. [2 Cir.] 218 F. 447, 134 C.C.A. 247; American, etc., Co. v. O'Halloran [2 Cir.] 229 F. 77, 143 C.C.A. 353; American Banana Co. v. United Fruit Co., 213 U. S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann. Cas. 1047."

While it is contended that one or more of the expressions just quoted, with particular reference to the necessity of alleging the amount of damage sustained by the plaintiff in cases of the nature under consideration, have been weakened by certain language of the United States Supreme Court in Story Parchment Co. v. Paterson Parchment Paper Company et al., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, presently to be discussed, we believe that it may be safely said that to state a cause of action under Title 15, § 15, U.S.C.A., the plaintiff must allege facts showing a violation of the Anti-Trust laws and facts showing damage to his business or property, in some amount susceptible of expression in figures, proximately resulting therefrom.

It will be noted from the foregoing that allegations of fact showing a violation of the law, should they be found in the complaint under consideration, are not in themselves sufficient; facts showing damages that can be measured in dollars, proximately resulting therefrom, must also appear; and, in this connection, it should be borne in mind that this is not an action to enjoin the alleged unlawful practices, or a criminal prosecution for violation of the Anti-Trust laws. As stated in Jack v. Armour & Co. et al., supra, "The question whether the United States could sue upon such a showing as here made is not involved and is neither important nor decisive," and in Glenn Coal Co. v. Dickinson Fuel Co. et al., supra, "A mere conspiracy with intent to violate the law while it may be the basis of a valid indictment under the criminal sanction of the Anti-Trust Act, does not give rise to a personal civil suit for damages." This is an action for damages alleged to have been heretofore suffered by plaintiff's assignors; and we have concluded that the determinative question in the entire case is whether the amended complaint contains legally sufficient allegations with particular reference to damages. With this thought in mind, we will attempt to analyze the said complaint as supplemented by the bills of particulars:

It is alleged that the plaintiff is a nonprofit, cooperative corporation "composed of each and every strawberry grower in the State of Louisiana who ships strawberries in interstate commerce and functions as the marketing agency for its members in the marketing and distribution of strawberries;" that each and every member of its association, of which there are 8,795, has orally assigned to the plaintiff all of his right, title, and interest in and to all the damages to his business which he has sustained, as set out in the complaint; that the defendants were, prior to the times mentioned in the complaint, and are now, engaged in the retail grocery business as the owners and operators of retail stores located throughout the United States; that at the times mentioned in the complaint the A. & P. owned, operated, and controlled a chain of over 13,300 stores in at least thirty-five states of the Union; that Kroger had a chain of over 3,990 retail stores in the United States; and Safeway a chain of over 3,020 retail stores in the United States; that the defendants handled in the years 1937 and 1938 approximately 25% of plaintiff's strawberries at retail

through their stores operated throughout the United States.

Then, in what is designated as count one of the amended complaint, follow the alleged violations of Sections 1 and 2 of the Sherman Anti-Trust Act, in which it is charged that the defendants combined and conspired with the object and intent of stifling competition and monopolizing the retail distribution of foodstuff products, particularly strawberries; that they employed the merchandising technique of using "loss leaders" of certain products, and particularly plaintiff's strawberries, to destroy the business of competitors, and in that way control the sole outlet for strawberries and other food products, and that the result of said conspiracy was to enable them to dictate the price to be paid for plaintiff's strawberries and to create a monopoly unto themselves for the exclusive distribution of all strawberries and agricultural and foodstuff commodities at retail in the United States.

Following this are the allegations of damages, with which we are particularly concerned, the allegations being that during the 1937 season plaintiff's assignors shipped in interstate commerce 3,400 cars of strawberries, or 2,502,400 crates of strawberries, for which they received an average of $1.57 per crate; that "had it not been for the illegal acts of the defendants herein, the plaintiff through its members, the strawberry farmers of Louisiana, would have received * * * $6,005,760. for their strawberries, or an average of * * * $2.40 per crate, making a net loss to the plaintiff, through its members, the strawberry farmers of Louisiana, of * * * $2,076,992.;" that during the 1938 season the plaintiff, through its members, shipped in interstate commerce 2,500 cars of strawberries, or 1,840,000 crates, for which its members received an average of $1.97 per crate; that had it not been for the alleged illegal acts of the defendants, the plaintiff, through its members, would have received $4,324,000 for their berries, or an average of $2.35 per crate; making a total loss to the strawberry farmers of Louisiana of $699,200.

It is then alleged that the entire loss and damage was caused solely by the defendants' wrongful acts.

The plaintiff's definition of "loss leaders," as given in the bill of particulars, has heretofore been quoted in full.

In count two, many of the allegations of the first count are adopted, and the remainder are practically identical with those of count one, except for the charge of an alleged violation of the Clayton Act. It is alleged that the use of strawberries as "loss leaders" by the defendants resulted in a price depreciation of the entire strawberry market and an elimination of competition in the strawberry field, and it is further charged that the defendants "in the course of such commerce, discriminated in price and caused a discrimination in price between different purchasers of the said strawberries * * * who purchased from retail stores throughout the United States * * * and the effect of such discrimination was to substantially eliminate competition and tended to create a monopoly in the sale of strawberries." The allegations of damages are identical with those in the first count.

In count three, many of the allegations of the first count are likewise adopted, and it is charged, in effect, that the defendants resorted to the merchandising technique of using "loss leaders" as a means of price discrimination in said products, and more particularly in plaintiff's strawberries, with the object of destroying competition and in that way controlling the sole outlet for plaintiff's strawberries, and thereafter sold and contracted to sell plaintiff's strawberries at unreasonably low prices and below the purchase price, for the purpose of destroying competition and eliminating competitors, practically throughout the United States. As in count two, so in count three, damages are set forth and calculated on the same basis as in count one.

The prayer of the complaint is for judgment for the sum total of the damages claimed, trebled, plus interest and costs, including a reasonable attorney's fee.

■ Now, conceding, without deciding, that the plaintiff has in each count of the complaint alleged facts showing a violation of the Anti-Trust laws, it has, in our opinion, failed to state a cause of action under the treble damage statute because it has not alleged facts showing damage to the business or property of its assignors in an amount susceptible of expression in figures, proximately resulting from the alleged illegal acts.

This suit was originally brought as a class action by the Louisiana Farmers'

Protective Union, Inc., and one Ellis M. Jenkins, one of the members of said association, who sued "individually for himself, and representing all other members," but when the amended complaint was filed, Jenkins was dropped as a party plaintiff, and the remaining plaintiff, Louisiana Farmers' Protective Union, Inc., sued as the alleged assignee of its 8,795 members. It did not, however, attempt to allege separate damages to its several assignors, but alleged damages in a lump sum to the group, which group it is alleged is composed of each and every strawberry grower in Louisiana who shipped strawberries in interstate commerce in the years 1937 and 1938. This sum was arrived at by alleging that during the year 1937 the plaintiff's members shipped in interstate commerce 3,400 cars of strawberries, for which they received an average price of $1.57 per crate; that during the season of 1938 they shipped 2,500 cars of strawberries, for which they received an average price of $1.97 per crate; and that had it not been for the alleged illegal acts of the defendants herein, they would have received an average of $2.40 per crate during the 1937 season, and $2.35 per crate during the 1938 season; and they claim the difference between these alleged averages as damages. It will be noted that the plaintiff sues for no damage to itself, and bases its right to maintain the suit solely upon the 8,795 assignments. Therefore, the plaintiff is suing as assignee on 8,795 separate, individual claims. Now, had any one of the assignors brought suit against the defendants in his own name and upon his own claim, it would, of course, have been necessary that he allege damage to his business or property proximately resulting from the alleged unlawful acts of the defendants and in some amount susceptible of expression in figures; and the fact that he assigns his claim to another party cannot change this rule in the least. The plaintiff, as assignee, can have no better right than that of its assignor; it steps into his shoes; and the same principle applies whether the plaintiff sues as the assignee of one or of 8,795 assignors. This, it seems to us, is elementary. It is, therefore, necessary that the plaintiff allege facts from which damage to each and every one of its assignors in his individual business can be legally and logically inferred. Prior to the filing of the amended complaint herein, the situation was somewhat analogous to that in the case of Alabama Independ-

ent Service Station Ass'n, Inc., et al. v. Shell Petroleum Corporation et al., D.C., 28 F.Supp. 386, 390, wherein the association and certain of its members, service station operators, brought suit against the defendants for damages for violation of the Anti-Trust laws, and the question was raised as to the capacity of the association to maintain the action as a real party at interest, or otherwise. The court held that the association was not a proper party plaintiff, but stated that the remaining plaintiffs, as operators of filling stations, might properly remain and sue on behalf of all those similarly situated, but that for the recovery of damages, each member of the class must intervene to assert and prove his own damages. In this connection, the court used the following language:

"The Alabama Independent Service Station Association, Inc., will be stricken as a plaintiff. We may add that the remaining plaintiffs, as operators of gasoline service stations, may properly remain as plaintiffs, and may sue on behalf of all of the similarly situated parties described in the complaint. See Rule 23(a) (3), Rules of Civil Procedure [28 U.S.C.A. following section 723c]; Moore's Federal Practice, Vol. 2, pp. 2241 et seq. However, for the recovery of damages, each member of the class must intervene to assert and prove such damages to himself."

In the Alabama case, the court held that each member of the association who intervened must assert and prove his damages; and the plaintiff, in the instant case, by obtaining assignments from its members, cannot thereby disregard the requirement that the damage to each of its assignors be asserted.

Relative to the lumping of the damages, the plaintiff has this to say in its brief: "The strawberry growers originally had each a separate cause of action, and each separate cause of action, if proved, constituted a fractional portion of the damage done the entire group, or whole, of the strawberry growers of Louisiana. The petition of the plaintiff, after all the causes of action of the individuals were assigned to it, now petitions the relief of the Federal District Court for the entire damage done to the growers of the strawberry crop in Louisiana by the defendants for the respective years complained of. This is the premise of the plaintiff. Repeating, the plaintiff has the right, and has elected to pursue the right, as assignee of all of the

fractional interests of the strawberry growers (or individual causes of action, as they may be termed) to file suit in a single claim for damages against the defendants for the total sum of the compensating entire damage done its respective assignors."

In other words, it takes the position that, having alleged in a lump sum damage to all of the strawberry growers in Louisiana who in 1937 and 1938 shipped strawberries in interstate commerce, and having alleged that each and every one of said strawberry growers has orally assigned his claim to it, therefore, since it owns all the claims of all the parties who raised strawberries in Louisiana in 1937 and 1938, for shipment in interstate commerce, and has alleged damage to the entire group, it has sufficiently alleged damage to each one of the growers, and has a right to recover therefor.

We do not deem it necessary to pass upon the validity of the alleged oral assignments, but, conceding, for the sake of argument, that oral assignments of claims of this nature are valid in Louisiana, and conceding that plaintiff's alleged assignors, by reason of their failure to raise their hands at the meeting of the union at Hammond, thereby assigned their claims to the plaintiff, the court would still have to go a long way to accept, even for the purpose of a motion to dismiss, the allegations that all of the strawberry growers in Louisiana who shipped strawberries in interstate commerce during the years 1937 and 1938 are members of its association, that all of said parties were present at the meeting of the union at Hammond, and that all of them assigned their claims to it. A motion to dismiss of the nature under consideration is equivalent to the general demurrer; Federal Life Ins. Co. v. Ettman, 8 Cir., 120 F.2d 837; and "a demurrer does not admit facts which the court will take judicial notice are not true, nor does the rule apply to legally impossible facts, * * *." 49 C.J. pages 440, 441. The plaintiff is seeking damages arising out of the sale of strawberries which were grown during the months of March to May, inclusive, 1937, and March to May, inclusive, 1938. Among all the strawberry growers in Louisiana who grew berries for out-of-state markets there are bound to have been men of all ages and conditions of health, and it is inconceivable that all of those who were growing strawberries in .the month of May, 1937, were alive and attended the meeting at Hammond in March, 1939, and were at the assemblage when the resolution mentioned in plaintiff's bill of particulars was adopted. Moreover, in such a large group it is almost inconceivable that no person under disability and no corporation had an interest in any of the crops. Neither is it likely that all who were members of the plaintiff union in May, 1937, maintained their membership by paying the dues of $1 per year to March, 1939. And our common sense teaches us that it would be impossible to get all members of a group as large as the strawberry growers of Louisiana to unite in an action of this character. But even so, plaintiff has failed to allege facts from which it appears that each of its alleged assignors was damaged in some amount susceptible of expression in figures. It alleges that the strawberry growers of Louisiana received an average of $1.57 per crate for the 1937 crop, and an average price of $1.97 per crate for the 1938 crop, whereas, had it not been for the alleged illegal acts of the defendants, they would have received an average of $2.40 per crate for the 1937 crop, and an average of $2.35 per crate for the 1938 crop. We are forced to take it that these are theoretical figures, since no basis for calculation is furnished by the plaintiff. While the allegations with reference to the violations of the Anti-Trust laws would apply to each of the claims sued on, damages would vary in each particular case. It is alleged in the amended complaint that berries were sold, beginning in the latter part of the month of March, and through to the latter part of May, in both 1937 and 1938. The same price would not obtain on each and every day, even for berries of the same quality, and, of course, each of the growers did not deliver berries on every day during the season. Nor can it be assumed that all of the berries sold by each grower were of the same variety and quality. It is a known fact that strawberries are grown in many states of the union, and that Louisiana strawberries compete with those from other states. The court takes judicial notice of the general course of agriculture. 23 C.J., Evidence, Sec. 1815, page 64; Floyd et al. v. Ricks, 14 Ark. 286, 58 Am.Dec. 374; Tomlinson v. Greenfield, 31 Ark. 557; Jones on Evidence, Civil Cases, Third Edition, § 129, page 171. Further, strawberries compete with other berries and fruits. The prices of competing berries and fruits do not remain stable, but, on the

other hand, fluctuate to a certain extent, and the market price of Louisiana strawberries on a given day is necessarily influenced thereby. The plaintiff alleges an average price, which means that some of the growers received more and some received less than the price named. It is certainly possible that some of those who received more than the average price were not damaged at all. It is clear to us that the plaintiff has failed to allege facts showing that "John Smith," one of its assignors, suffered damage in an amount susceptible of expression in dollars. Plaintiff must bring itself within the rule enunciated by the court. It is asking for damages in an enormous sum, and that those damages be trebled, but it furnishes the court no basis for calculation, nothing wherewith in any degree to measure the damages. The primary purpose of the Anti-Trust laws is to protect the public. The private remedy is incidental. Glenn Coal Co. v. Dickinson Fuel Co. et al., supra; D. R. Wilder Manufacturing Company v. Corn Products Refining Company, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, Ann.Cas.1916A, 118. The statute allowing treble damages is strictly construed. Plaintiff's allegation of lump damages to the group of strawberry growers falls far short of compliance with the rule laid down in the cases of Jack v. Armour & Co. et al., supra, Keogh v. Chicago & Northwestern Ry. Co. et al., supra, and American Sea Green Slate Co. et al. v. O'Halloran et al., supra.

Moreover, the necessary causal relationship between the alleged violations of the statutes and the alleged damage to plaintiff's assignors, does not appear:

In count one, it is first alleged that the defendants combined and conspired with the object and intent of stifling competition and monopolizing the retail distribution of food products in the United States, particularly strawberries. As stated in the Glenn Coal Co. case, supra, a mere conspiracy to violate the Anti-Trust laws does not give rise to a personal civil suit for damage. It is then alleged that in pursuance of the plan the defendants employed the merchandising technique of using "loss leaders" of said products, and more particularly of plaintiff's strawberries, to destroy the business of competitors and in that way control the sole outlet for strawberries and other food products. It is not alleged, however, that the business of defendants' competitors was destroyed. The plaintiff then alleges that the result of said conspiracy was to permit the defendants to dictate, not only the price to be paid for plaintiff's strawberries, but to create a monopoly unto themselves for the exclusive distribution of all strawberries and agricultural and foodstuff commodities at retail in the United States. And preceding, and in connection with, these allegations, it is alleged that in 1937 and 1938 the defendants handled approximately 25% of plaintiff's members' strawberries at retail. It is then stated that had it not been for these acts on the part of the defendants, the plaintiff's assignors would have received a higher average price than the average price that was received for their 1937 and 1938 crops. Just why or how they would have received a larger price is not stated. It is stated in count two that the use of strawberries as "loss leaders" by the defendants resulted in price depreciation of the entire strawberry market and an elimination of competition in the strawberry field, and for the purpose of this opinion we will take it that a similar allegation has been made in count one. The sum total of these allegations is that the defendants entered into a conspiracy to monopolize the retail distribution of food products in the United States, particularly strawberries; that they handled 25% of the Louisiana strawberry crops for 1937 and 1938, and employed the merchandising technique of using "loss leaders" to destroy the business of competitors, and in that way control the sole outlet for strawberries, and that the result was the creation of a monopoly unto themselves for the exclusive distribution of all strawberries and agricultural and foodstuff commodities at retail in the United States, which resulted in a price depreciation of the entire strawberry market and an elimination of competition in the strawberry field, and that had it not been for this, the plaintiff's assignors would have received higher average prices for their crops for said years than they did.

We do not think that the plaintiff has here stated facts which logically lead to the conclusion that the damage claimed proximately resulted from the alleged unlawful acts on the part of the defendants. We do not think that the plaintiff has alleged facts showing an effective monopoly, that is, a monopoly sufficiently effective to bring about the alleged damage to plaintiff's assignors. If the defendants

purchased only 25% of the Louisiana strawberries shipped in interstate commerce, other parties, evidently their competitors, purchased the remaining 75%. There is no allegation to the effect that the defendants purchased strawberries from any other state whatever, and it is a well known fact that strawberries are grown rather generally throughout the United States. The 75% of the Louisiana crop purchased by others and strawberries grown elsewhere necessarily entered into competition with the 25% of the Louisiana crop purchased by the defendants, and naturally influenced the price received by the Louisiana growers for their berries. We have commented on this heretofore. It may be argued that strawberries are a seasonal crop and on that account the competition from other states is limited, but, on the other hand, a large part of the strawberry crop is canned and preserved and sold and distributed throughout the entire twelve months of the year. Furthermore, strawberries that are canned and used locally throughout the United States enter, to a certain extent, into competition with Louisiana strawberries.

■ The allegation that the result of the conspiracy was to create a monopoly unto the defendants for the exclusive distribution of all strawberries and agricultural and foodstuff commodities at retail in the United States cannot be accepted as true even on motion to dismiss. It is well known that there is no monopoly in the retail food business. The court will take judicial notice of the fact that other chain stores and "independent" grocery stores are quite numerous throughout the United States. State v. Miksicek, 225 Mo. 561, 125 S.W. 507, 135 Am.St.Rep. 597; 23 C.J., Evidence, § 1816, page 64.

The allegation with reference to price depreciation in the entire strawberry field having been brought about by the sale of 25% of the Louisiana crop as "loss leaders," fails to take into consideration other factors which cause a price depreciation in agricultural and food products, such as overproduction, labor conditions, weather conditions, manner of cultivation and fertilization of the crop, quality, etc. No facts are alleged in the complaint relative to the amount of strawberries raised either in Louisiana or in the entire United States during the years 1937 and 1938. The facts alleged with reference to the Louisiana crop deal solely with berries shipped in interstate commerce during those years. Neither does the complaint contain any allegation with reference to the quality of the Louisiana berries during the two years in question as compared to the quality of berries raised elsewhere. According to the complaint, the strawberry farmers of Louisiana shipped 3,400 cars of strawberries during the 1937 season, for which they received an average price of $1.57 per crate, and 2,500 cars during the 1938 season, for which they received an average of $1.97 per crate. It is not stated why the average price received was higher in 1938 than it was in 1937. It is noted, however, that the plaintiff contends that its assignors suffered nearly three times as much damage on account of the alleged illegal acts of the defendants in 1937 as they did in 1938, it being contended that the damage in 1937 was $2,076,992, whereas, in 1938 it was $699,200. There are no direct allegations in the complaint to explain this difference. This state of affairs, however, does not indicate that the sale of strawberries as "loss leaders" in 1937 had a deleterious effect on the 1938 market. It is not alleged directly that there was a smaller production in 1938 than in 1937, but it is alleged that 900 less cars were shipped, which would indicate a smaller production, and which tends also to illustrate the effect of a large production on the average market price. Here we see exemplified the observation we have heretofore made to the effect that, insofar as the allegations of the complaint are concerned, the difference in average market prices may have been due to overproduction or other factors rather than the sale of strawberries at retail as "loss leaders."

■ It is to be kept in mind that the plaintiff's assignors are not competitors of the defendants. Had this action been brought by the proprietors of retail stores competing with the defendants, it might be logically assumed that damages to them would proximately flow from the alleged illegal acts of the defendants, but no such assumption can be indulged in where the complaining parties are not competitors of the defendants; and here, in our opinion, is the main difficulty that confronts the plaintiff. Moreover, where there is competition between the plaintiff and the defendant, the damages are more readily measured because the plaintiff's business experience before and after the consummation of the alleged illegal acts provides a basis for

determination of the damages. The independent and other chain grocery stores which compete with the defendants may have been injured by the sale of strawberries as "loss leaders" by the defendants, but they are not complaining here, and, as stated in Carbonic Gas Co. of America, Inc., v. Pure Carbonic Co. of America et al., D.C., 4 F.Supp. 992, 993:

"A plaintiff may not, therefore, assume the role of a deus ex machina for other parties and found a cause of action in its own favor on discrimination in violation of the Clayton Act as to such other parties."

It is true that we might speculate that the growers suffered to some extent from the repercussion, due to the effect upon the independent and other chain grocery stores of the sale of Louisiana berries as "loss leaders," but such damages, insofar as the allegations of the amended complaint show, would be speculative and remote, rather than direct. It does not necessarily follow, however, that even if the defendants had sold the strawberries at higher prices, the growers would have received a higher price for their crop. The plaintiff so concludes in its complaint, but there are no allegations of fact therein upon which to base such a conclusion. It is well known that ordinarily consumption increases as the price of a commodity declines, and that consumption decreases as the price is raised. The sale of strawberries as "loss leaders" by the defendants did not necessarily damage the growers, and there are no allegations of fact in the complaint showing that they were proximately injured thereby.

The cases cited by the plaintiff, on the question of the sufficiency of the allegations of the amended complaint with particular reference to damages, are not in point. With a few exceptions, they fall into two groups: one, cases dealing with the manner of stating a cause of action, mainly decisions construing the Federal Rules of Civil Procedure, it being contended in connection with these citations that many of the older theories of pleading are no longer applicable, and that plaintiff's amended complaint is good under the plan for simplification of pleadings provided for under the new rules and discussed in these decisions; and, two, cases where the plaintiff and defendant were competitors and the allegations of the respective complaints were such that it could be "logically and legally" inferred that measurable damages proximately resulted from the alleged illegal acts.

In the first group plaintiff has cited United States v. Schine Chain Theatres, Inc. et al., D.C., 1 F.R.D. 205, Kentucky-Tennessee Light & Power Co. v. Nashville Coal Co. et al., D.C., 37 F.Supp. 728, 733, and William F. Luebke Co. v. Manhardt et al., D.C., 37 F.Supp. 13, cases, among other things, construing Rule 12(e), 28 U.S.C.A. following section 723c; Monarch Tobacco Works v. American Tobacco Co. et al., C.C., 165 F. 774, in connection with a motion to make the petition more definite and certain; certain language from Metzger v. Breeze Corporation, Inc., et al., D.C., 37 F.Supp. 693, with reference to the modern philosophy concerning pleading; Parts Mfg. Corporation v. Weinberg et al., D.C., 1 F.R.D. 329, Grauman et al. v. City Company of New York, Inc., et al., D.C., 31 F.Supp. 172, Lowe et al. v. Consolidated Edison Co., Inc., et al., D.C., 1 F.R.D. 559, Kuhn v. Pacific Mut. Life Ins. Co. of California et al., D.C., 37 F.Supp. 100, and Westmoreland Asbestos Co., Inc., et al. v. Johns-Manville Corporation et al., D.C., 30 F.Supp. 389, 392, construing Rule 10(b), 28 U.S.C.A. following section 723c. These decisions are not applicable here, and it is not necessary to discuss them in detail. The fact that the new rules provide a plan for simplification of pleading does not mean that the plaintiff is not required to state a cause of action, to state a claim showing that he is entitled to relief. In the final analysis, the instant case does not involve questions of the manner of pleading. The question is "has the plaintiff stated a cause of action under the treble damage statute?" Since counsel for the plaintiff have laid particular stress upon certain language of the court in Westmoreland Asbestos Co., Inc. et al. v. Johns-Manville Corporation et al., supra, however, we will discuss that case briefly: It was an action by the asbestos company, and others, for treble damages for conspiracy to eliminate competition and create a monopoly, and it was cited by the plaintiff in connection with a ruling of the court on a motion for an order directing each plaintiff to state its claim separately, which motion was denied. In denying the motion, the court said: "In view of the nature of the action itself and the alleged unity of interest of the corporate plaintiffs, it would appear to be detrimental to the plaintiffs if they were

obliged to separately state their claims." The complaint is not set out in the opinion, and we cannot determine definitely what the court had in mind when it referred to "the alleged unity of interest of the corporate plaintiffs"; however, there is a statement in the opinion to the effect that "it is claimed that all the corporate plaintiffs are, in reality, William G. Kuehn in that he wholly owned and controlled the corporations." This decision is of no practical value to us. The court was passing upon a motion under Rule 10(b), 28 U.S.C.A. following section 723c, of the Federal Rules of Civil Procedure, and not on a question as to whether or not the complaint stated a cause of action in damages. For another reason the decision is not applicable in the case at bar: there is no "unity of interest" between the 8,795 assignors of the plaintiff; it is not alleged in the complaint that any one of the strawberry growers had an interest in the crop of any of the others.

The plaintiff also cites Swift & Company v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518. This case was cited by us in 31 F.Supp. 483, 492, 493, in our opinion on the defendants' motions for a more definite statement and a bill of particulars, and we quoted at length from certain language of Mr. Justice Holmes in connection with a request that the plaintiff be required to state the exact times, places, and manner in which it claimed the defendants had dictated the prices on agricultural and foodstuff commodities, and the further request that it be required to state the times, places, and manner in which it claimed the defendants had controlled, or been able to control, the retail distribution of foodstuffs. The Swift case involved an action by the United States for an injunction against the commission of alleged violations of the Sherman Act. It is not in point here, where the question involved is whether or not the plaintiff has stated a cause of action in damages under the treble damage statute.

In connection with the foregoing group of citations, the plaintiff contends that its complaint is sufficient in that it has pleaded the ultimate facts. We do not agree with the plaintiff. We think that it has pleaded legal conclusions rather than ultimate facts. The motion to dismiss concedes the truth of all well pleaded facts but does not concede the truth of the legal conclusions pleaded. Federal Life Ins. Co. v. Ettman, supra.

In the second group of cases cited by plaintiff, on the question of damages, those mainly relied upon are: Story Parchment Company v. Paterson Parchment Paper Company et al., supra; Wheeler-Stenzel Co. v. National Window Glass Jobbers' Ass'n, 3 Cir., 152 F. 864, 10 L.R.A.,N.S., 972; Cilley v. United Shoe Machinery Co., D.C., 202 F. 598, 599; Hale v. O'Connor Coal & Supply Co., Inc., et al., C.C., 181 F. 267; and C. E. Stevens Company et al. v. Foster & Kleiser Co. et al., 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. 173.

The plaintiff has cited Story Parchment Company v. Paterson Parchment Paper Company et al., supra, in connection with the rule that requires a plaintiff in an action under the treble damage statute to allege facts showing damages to his business or property susceptible of expression in figures, and we have heretofore alluded to the fact that it is its contention that certain expressions of the courts quoted by us in connection with our statement of the rule have been weakened by certain language of the United States Supreme Court in the Story case. The language in question is to the effect that the rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount; and it is plaintiff's contention that by the use of this expression the supreme court has, to say the least, weakened the language of the Eighth Circuit Court of Appeals in Jack v. Armour & Co. et al., supra, wherein the court said that before recovery can be had by a private person under the treble damage statute "there must at least be an allegation of the manner, nature, extent, or amount of the injury sustained by such private person," and the holding of the Second Circuit Court of Appeals in American Sea Green Slate Co. et al. v. O'Halloran et al., supra, that: "To recover under the seventh section plaintiffs must show that, as a result of defendants' acts, actual damages were sustained—damages in some amount which is susceptible of expression in figures. These damages must be proved by facts from which their existence is logically and legally inferable—not by conjectures, or estimates. They must not be speculative, remote, or uncertain. As we understand the law, a jury may not merely guess that plaintiff lost $1,000 or $10,000 which they

might have made, even if they feel reasonably sure that some loss was sustained. They cannot award damage as they do for pain or suffering in an action for personal injuries, or for reputation as they do in a libel suit."

In the Story case, supra, suit was brought by a manufacturer of parchment paper against two of its competitors for damages for violation of Section 2 of the Sherman Anti-Trust Act. The proof showed that at the time the plaintiff entered the field the two defendants and another company (which was not joined in the suit for lack of jurisdiction) enjoyed a monopoly in the manufacture of parchment paper; that the plaintiff began to cut prices; that the other three companies combined and not only met the plaintiff's prices, but sold below its prices; and that a price war resulted; and the defendants, through mutual agreement and concerted action, cut the prices to such an extent as to totally destroy the business of the plaintiff. The plaintiff sued for two items of damage: one, what was termed by the district court "loss of profits," and, two, depreciation in value of its plant. The case was tried to a jury, which resulted in a verdict for the plaintiff in the sum of $65,000. On appeal to the circuit court of appeals, 1 Cir., 37 F.2d 537, the judgment was vacated and the case was remanded to the district court with directions to enter judgment for the defendants, on the ground that the plaintiff had not sustained the burden of proving that it had suffered recoverable damages. On appeal to the supreme court the judgment of the circuit court of appeals was reversed and the action of the district court in submitting the case to the jury was affirmed.

On item one, that is, "loss of profits," the plaintiff introduced proof of the prices which were maintained by the defendants for their products at the time it entered the field, which prices the plaintiff claimed were fair and reasonable, and of the prices at which it was forced to sell its products by reason of the unlawful combination; and it was the contention of the plaintiff that in these figures it had a yardstick by which the loss it sustained by reason of the sale of its products at sacrificial prices could be measured with a reasonable degree of certainty. The circuit court of appeals held, in effect, that the yardstick in question did not furnish a proper basis for the measurement of the damages, and that

the damages in question were speculative. In this connection, the supreme court [282 U.S. 555, 51 S.Ct. 250, 75 L.Ed. 544], said that "there was evidence of the prices received by petitioner before the cut prices were put into operation, and those received after, showing actual and substantial reductions, and evidence from which the probable amount of the loss could be approximated." The court also said: "It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." The court, however, stated further: "In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."

On the second item of damages, the depreciation in value of the plaintiff's plant, the court pointed out that there was evidence to the effect that the plant had cost $235,000, of which $90,000 had been used to purchase and install a parchmentizing machine, and that there was an estimate made on the witness stand placing the value of the plant after it had closed down at $75,000, which evidence, if accepted, would show a depreciation of more than the entire amount of the verdict, which included both items of damage; and, in this regard, the court said: "That there was actual damage due to depreciation in value was not a matter of speculation, but of fact which could not be gainsaid. The amount alone was in doubt."

It will be noted that while the supreme court used the expression stressed by counsel for plaintiff, the court at the same time indicated that damages in a case of the nature under consideration may not be determined by mere speculation or guess, and that the approximate extent of the damages as a matter of just and reasonable inference should be shown. We do not feel that the decision in the Story case has materially changed the rule that the burden

is upon the plaintiff in cases of this nature to show that he has suffered damages to his business or property "in some amount susceptible of expression in figures" (words used by the supreme court itself in Keogh v. Chicago & Northwestern Ry. Co. et al., supra), that is, as we take it, in an amount that can be measured in dollars.

The Story case is not in point with the case at bar. In the Story case the question involved was the sufficiency of proof to go to the jury; in the instant case, the sufficiency of the allegations of the complaint with particular reference to damages. In the Story case the plaintiff furnished the jury a yardstick by which to measure its damages, and there were facts in evidence upon which "the extent of the damages as a matter of just and reasonable inference" could be approximated; in the instant case no basis for measurement is furnished the court. In the Story case the plaintiff and the defendants were competitors and the plaintiff occupied a position in relation to the defendants whereby it would naturally suffer damages as a result of violations by them of Section 2 of the Sherman Anti-Trust Act, and there was ample evidence from which the "fact of damage" could be logically and legally inferred. In the instant case the suit is not brought by competitors of the defendants and the plaintiff has alleged no facts from which the "fact of damage," proximately resulting from the alleged illegal acts of the defendants, can be logically and legally inferred.

In citing C. E. Stevens Company et al. v. Foster & Kleiser Co. et al., supra, the plaintiff lays stress on certain language of the court to the effect that, while the allegations in that case with reference to damages were general, it could not be said that they were inadequate, and contends that there is an analogy between the allegations in the Stevens and those in the instant case. The facts in the Stevens case were as follows: The plaintiffs were engaged in the business of outdoor advertising, of procuring locations and erecting bill boards thereon for the purpose of the posting of bills and the painting of signs. The defendants were in the same line of business and were members of an association controlling 90% of the outdoor advertising in the Pacific Coast area. The action was for treble damages under the Sherman Anti-Trust Act, and the complaint alleged a conspiracy by the defendants to monopolize the business of bill posting by restraining interstate commerce in the transportation of posters, and alleged, as a part of the general conspiracy, local acts by the defendants done in an effort to prevent the plaintiffs from obtaining sites for bill posting. The case was heard on a motion to dismiss for failure to state a cause of action. The motion was sustained by the district court, and also on appeal by the circuit court of appeals, 9 Cir., 109 F.2d 764, on the ground that the complaint failed to allege that the conspiracy, insofar as it affected interstate commerce, was effective to damage the plaintiffs in their business, since there was no allegation in the complaint that the defendants' actions in the premises prevented the plaintiffs from obtaining or receiving posters. The circuit court of appeals was of the opinion that the allegations of damage to the plaintiffs' business were directed to the local acts of the defendants, rather than to any restraint in interstate commerce in the transportation of posters, and took the position that an anaylsis of the complaint as a whole showed that the alleged damage to the plaintiffs flowed not from their inability to obtain posters, but from their inability to obtain contracts and bill board sites upon which to execute them.

Upon appeal to the supreme court, the action of the lower courts was reversed and the motion to dismiss was overruled. The court did not set out all the allegations of the complaint in its opinion, and stated that it was contenting itself with sufficient allegations to indicate the question on which the case turned. It held, however, that the complaint sufficiently alleged a conspiracy in violation of Sections 1 and 2 of the Sherman Act and sufficiently alleged that the monopoly and restraint inflicted damage upon the business of the plaintiffs. The court said [311 U.S. 255, 61 S.Ct. 213, 85 L.Ed. 173]: "As we have said, the complaint alleges that the petitioner solicits contracts for poster advertising as does the respondent, Foster & Kleiser Co. The petitioner is thus in competition with Foster & Kleiser Co. in the effort to obtain contracts which call for the interstate shipment of posters for their execution. The complaint adequately charges a conspiracy to restrain the transportation of posters in interstate commerce, in aid of the attempted monopoly. It also charges other means and acts, local in character, with the

same aim. The conspiracy, with its effect on interstate commerce, is alleged to have caused the petitioner great expense and loss of profits; to have restrained and prevented petitioner from establishing a business in San Francisco, 'all to the great injury and damage of plaintiff'." The court added that "while these allegations are general, we cannot say that they are inadequate nor are we able to agree with the court below that they are coupled with and treated solely as the consequence of local activities of the respondents."

The Stevens case and the case at bar are not, with relation to damages, analogous. In the Stevens case the plaintiffs and defendants were competitors, and the causal connection, as shown by the complaint, between the alleged unlawful acts and the damage to the plaintiffs was apparent. Such is not true in the instant case.

Nothing would be gained by discussing Wheeler-Stenzel Co. v. National Window Glass Jobbers' Ass'n, supra, Cilley v. United Shoe Machinery Co., supra, and Hale v. O'Connor Coal & Supply Co., Inc., et al., supra, cited in plaintiff's second group of cases above referred to. In each of these cases the interested parties were competitors, and the respective complaints disclosed the fact that there was a definite causal relationship between the acts complained of and the alleged damages sustained. We have heretofore commented on the fact that where, in suits for damages under the Anti-Trust laws, the plaintiff and defendant are competitors, the causal relationship between violation and injury is frequently more plainly discernible than in actions where such is not the case.

The plaintiff has also cited Eastman Kodak Company of New York v. Southern Photo Materials Company, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684. In that case the plaintiff was engaged in selling photographic goods to professional photographers and to amateurs; the defendant was a manufacturer of photographic goods; the suit was for treble damages for violation of the Sherman Anti-Trust Act. The case was tried to a jury, which rendered a verdict for the plaintiff. The judgment was affirmed by the circuit court of appeals, 5 Cir., 295 F. 98, and in turn by the supreme court. The plaintiff contended that it suffered loss to its business, through loss of profits, by reason of the fact that the defendant had obtained a monopoly of a line of goods which plaintiff had been dealing in, and had in previous years been purchasing from the defendant at a dealer's discount. It alleged that the defendant, in furtherance of its purpose to monopolize, had refused to continue supplying such goods to the plaintiff at retailer's discounts; that the plaintiff, being thus deprived of the ability to obtain such goods, and to supply the same to its trade, had sustained damage in the loss of profits which it would have realized in the four years covered by the suit, had it been able to continue the purchase and sale of the goods.

One of the questions in the case was whether there was any competent and legal proof upon which to base the measurement of the plaintiff's damages. On this point, the supreme court quoted with approval the following language from the opinion of the circuit court of appeals: "The plaintiff had an established business, and the future profits could be shown by past experience. It was permissible to arrive at net profits by deducting from the gross profits of an earlier period an estimated expense of doing business. Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." [273 U.S. 359, 47 S.Ct. 405, 71 L.Ed. 684.] The court also said: "We conclude that plaintiff's evidence as to the amount of damages, while mainly circumstantial, was competent, and that it sufficiently showed the extent of the damages, as a matter of just and reasonable inference, to warrant the submission of this question to the jury. The jury was instructed, in effect, that the amount of the damages could not be determined by mere speculation or guess, but must be based on evidence furnishing data from which the amount of the probable loss could be ascertained as a matter of reasonable inference."

This case is of no value to the plaintiff. Here the parties had been doing business previously, and the "future profits could be shown by past experience." In the case at bar no "reasonable basis of computation is afforded."

In count two, an attempt to charge a violation of the Clayton Act and of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, 15 U.S. C.A. § 13, is made. It is alleged that the defendants have resorted to the merchandising technique of using "loss leaders" of

certain products, and more particularly plaintiff's members' strawberries, with the object and intent of destroying competition, and in that way controlling the sole outlet for strawberries and other food products; that the use of strawberries as "loss leaders" resulted in a price depreciation of the entire strawberry market, and an elimination of competition in the strawberry field; that the defendants having purchased the strawberries mentioned in the complaint from the plaintiff's members, discriminated in price and caused a discrimination in price "between the different purchasers of the said strawberries throughout the United States of America who purchased from retail stores throughout the United States and in stores other than the retail stores" owned, operated, and controlled by the defendants, and that the effect of such discrimination was to substantially eliminate competition and tended to create a monopoly in the sale of strawberries; that after the defendants purchased the strawberries from the plaintiff's members they caused them to be sold at a price below the purchase price, and discriminated against the purchasers of other and independent retail stores throughout the United States, which said independent retail stores were unable to meet the sacrificial prices at which the defendants sold the strawberries, and that the effect of this discrimination substantially lessened competition and tended to create a monopoly over the strawberry industry.

In connection with the foregoing allegations, numerous allegations contained in count one, including the one to the effect that the defendants handled 25% of plaintiff's members' strawberries in the years 1937 and 1938, are reiterated; and the damages are alleged and computed in the same manner as in count one.

The defendants contend in regard to count two, among other things, that the plaintiff has failed to state facts showing a violation of either the Clayton Act, or of the Clayton Act as amended by the Robinson-Patman Price Discrimination Act, and, with particular reference to the Clayton Act as amended, that the plaintiff's assignors, being neither competitors of, nor purchasers from, the defendants, are not within the class of persons, in relation to the situation described in the complaint, who are entitled to relief under the Clayton Act as amended by the Robinson-Patman Price Discrimination Act. But we do not find it necessary to pass upon these questions, because, in our opinion, the allegations of the second count of the amended complaint are legally insufficient with particular reference to damages. Most of what we have said with regard to count one is equally applicable to count two. As in count one, so in count two, the plaintiff has failed to allege facts showing that its assignors were damaged in amounts susceptible of expression in figures as a proximate result of the alleged unlawful acts of the defendants. The plaintiff alleges that the defendants discriminated in price between the different purchasers of strawberries who purchased from retail stores other than those of the defendants. If plaintiff has here charged a violation of the law, insofar as the complaint shows, the persons proximately damaged by the illegal act would be those who were discriminated against, and not the plaintiff's assignors.

Count three is based upon Section 3 of the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13a, in which count it is charged that the defendants resorted to the use of "loss leaders" as a means of price discrimination in certain products, and more particularly in plaintiff's members' strawberries, with the object and intent of destroying competition, and in that way controlling the sole outlet for plaintiff's members' strawberries, and that thereafter the defendants sold plaintiff's members' strawberries at unreasonably low prices and below the purchase price, for the purpose of destroying competition and eliminating competitors throughout the United States.

The allegation that the defendants handled 25% of the plaintiff's members' strawberries in the years 1937 and 1938 is reiterated, and also the allegations of counts one and two with reference to damages to plaintiff's assignors.

The defendants contend, with particular reference to count three, that Section 3 of the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13a, upon which this count is based, is not an amendment of the Clayton Act and is not one of the Anti-Trust laws within the meaning of Section 1 thereof, 15 U.S.C.A. § 12, but is a separate criminal statute, and that Section 4 of the Clayton Act, 15 U.S.C.A. § 15, providing for civil actions for treble damages for violation of the Anti-Trust laws, does not apply; and, also, that Section 3 of the Robinson-Patman Price Discrimination

Act, insofar as it prohibits sales at unreasonably low prices, is void for uncertainty. These are interesting questions, which, so far as we have been able to determine, have not been decided by the courts. However, we find it unnecessary to pass upon them here. As heretofore stated, we have concluded that the determinative question in the entire case, and on each count of the complaint, is whether or not it contains legally sufficient allegations with particular reference to damages to the business or property of the plaintiff's assignors. What we have said in this connection with reference to count one is also applicable to count three; and, so far as the allegations of the complaint are concerned, if injury has proximately resulted to anyone by reason of the alleged unlawful acts of the defendants as charged in count three, it is not to plaintiff's assignors, but to the competitors of the defendants.

The point upon which we have decided this case, that is, the insufficiency of the complaint with particular reference to the allegations of damages to plaintiff's assignors, was raised and argued in connection with the motions of the defendants for a bill of particulars and more definite statement, addressed to the amended complaint, but we declined to pass upon the point at the time, stating in our written opinion on said motions that all such arguments were addressed to the sufficiency of the complaint in regard to stating a cause of action, and that we would defer passing upon them until they were raised directly in a motion to dismiss, which motion counsel for defendants stated would be filed later. Louisiana Farmers' Protective Union, Inc. v. Great Atlantic & Pacific Tea Company of America, Inc., et al., D.C., 31 F. Supp. 483, 493. The motions to dismiss now under consideration were subsequently filed, and the question was briefed by plaintiff and defendants. The motions were set down for hearing on oral argument. On the day set, the attorney who was to make the main argument on behalf of the plaintiff was prevented from being present by unavoidable casualty, and the hearing was continued. However, at the time and in open court we called special attention to this question and indicated that we were much interested in it, and suggested that counsel might desire to file supplemental briefs on it. Our remarks at the time were taken down by the court reporter, were transcribed, and copies were furnished both sides. Thereafter the question was again briefed by plaintiff and defendants, and in a most exhaustive manner, and was argued orally at great length when the case was finally submitted. As has been seen, the original complaint was amended, and thereafter supplemented by a bill of particulars and three amendments thereto. In our opinion, the plaintiff has failed to state a cause of action upon which relief can be granted it, and the defects pointed out are inherent and basic and go to the heart of the complaint; and we feel that nothing would be gained by deferring longer its dismissal. Arthur v. Kraft-Phenix Cheese Corporation, D.C., 26 F.Supp. 824, 830; Abouaf et al. v. J. D. & A. B. Spreckels Co. et al., D.C., 26 F.Supp. 830, 834.

The motions to dismiss are sustained.