## ALEXANDER MILBURN CO. v. UNION CARBIDE & CARBON CORPORATION et al.

(Circuit Court of Appeals, Fourth Circuit. October 19, 1926.)

No. 2467.

**I. Monopolies 28.**

Declaration for recovery of triple damages under Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) must describe with definiteness combination or conspiracy relied on, as well as acts done which resulted in damage.

**2. Monopolies 28.**

Circumstances *held* not to show conspiracy in restraint of interstate and foreign trade and commerce as would authorize recovery of triple damages under Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830).

**3. Monopolies ⬤⟳20.**

Unity of control secured by stock ownership of holding company does not constitute conspiracy in restraint of trade, where there is no competition between products of companies controlled.

**4. Monopolies ⬤⟳28.**

To recover triple damages under Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), plaintiff must not only show damage resulting from wrongful act, but that act was done in furtherance of conspiracy.

**5. Monopolies ⬤⟳28.**

Alleged loss of profits on contracts because of improper influence of another does not justify recovery of triple damages under Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), in absence of showing that act was done in carrying out combination or conspiracy.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Action by the Alexander Milburn Company against the Union Carbide & Carbon Corporation and others. Judgment for defendants, and plaintiff brings error. Affirmed.

Edgar Allan Poe and J. Kemp Bartlett, both of Baltimore, Md. (Guion Miller and Bartlett, Poe & Claggett, all of Baltimore, Md., on the brief), for plaintiff in error.

W. Calvin Chesnut, of Baltimore, Md., and Julian C. Harrison, of New York City (De Witt V. D. Reiley, of New York City, and Haman, Cook, Chesnut & Markell, of Baltimore, Md., on the brief), for defendant in error Davis-Bournonville Co.

Edwin G. Baetjer, of Baltimore, Md. (Charles McH. Howard, of Baltimore, Md., Fred H. Haggerson, of New York City, and William L. All and Venable, Baetjer & Howard, all of Baltimore, Md., on the brief), for defendants in error Union Carbide & Carbon Corporation and its constituents.

Before WADDILL and PARKER, Circuit Judges, and ERNEST F. COCHRAN, District Judge.

PARKER, Circuit Judge. This action was instituted to recover triple damages under the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830). At the conclusion of plaintiff's testimony, the District Judge sustained defendants' motion for a directed verdict, and the correctness of this ruling is practically the only question presented by the writ of error. While many exceptions were taken to the exclusion of testimony, it is unnecessary to consider them in detail, for, in passing upon the exception to the direction of the verdict, we have reviewed the excluded testimony as well as that which was admitted, and we are satisfied that, taking all of the testimony together, plaintiff did not present a case which should have been submitted to the jury.

The plaintiff in the court below was the Alexander Milburn Company, a corporation of Baltimore, engaged in the manufacture and sale of oxyacetylene cutting and welding apparatus and of portable acetylene flare lights. The defendants were the Davis-Bournonville Company and the Union Carbide and Carbon Corporation and its subsidiary and affiliated companies, in which it owns a controlling interest, viz., the Union Carbide Company, the Union Carbide Sales Company, the Oxweld Acetylene Company, the Oxweld Railroad Service Company, the Linde Air Products Company and the Prest-O-Lite Company. All of these defendant companies are engaged in one branch or another of the oxyacetylene industry. The Davis-Bournonville Company is engaged in the manufacture and sale of oxyacetylene cutting and welding apparatus. The Union Carbide and Carbon Corporation is a holding company and owns the stock of the other defendant corporations, except that of The Davis-Bournonville Company. The Union Carbide Company manufactures calcium carbide, from which acetylene gas is made. The Union Carbide Sales Company sells the carbide manufactured by the Union Carbide Company. The Prest-O-Lite Company manufactures and compresses acetylene gas and sells it in containers. The Linde Air Products Company compresses oxygen, which is used in conjunction with acetylene gas in the cutting and welding industry, and sells this oxygen in portable cylinders. The Oxweld Acetylene Company manufactures and sells oxyacetylene cutting and welding apparatus. The Oxweld Railroad Service Company, as its name implies, is a service company. It installs for railroad companies oxyacetylene cutting and welding apparatus, keeps it in repair, and furnishes supervision and instruction as to its use.

The declaration contains four counts, the first three of which charge, respectively, a combination, a contract, and a conspiracy in restraint of interstate and foreign trade and commerce, and the fourth of which charges a conspiracy to monopolize such trade and commerce. Each of the counts begins by charging a violation of the Sherman Act in the most general terms, using in effect the words of the statute, and alleging that the defendants agreed to secure and control for

themselves the interstate and foreign trade and commerce in the articles of their manufacture, to the exclusion of all competitors. There follows in each count an allegation that part of the scheme, contract, or arrangement among the parties to the combination was:

"(a) That through the defendant the Oxweld Railroad Service Company, to the exclusion of all competitors, there should be sold to all the railroads in the United States the oxygen manufactured by the defendant the Linde Air Products Company, the acetylene manufactured by the defendant the Prest-O-Lite Company, the oxyacetylene apparatus and appliances for welding and cutting metals and acetylene lighting manufactured by the defendant the Oxweld Acetylene Company, and the carbide manufactured by the defendant the Union Carbide Company.

' "(b) That all oxyacetylene welding and cutting apparatus and appliances, 'portable acetylene lights and acetylene generators required by the Army, Navy, and other departments of the United States government should be furnished and supplied, to the exclusion of all competitors, by the defendant the Davis-Bournonville Company, and that the gases and carbide required by said departments should be portioned out to the exclusion of all competitors, among the defendants the Union Carbide Sales Company, the Prest-O-Lite Company, and the Linde Air Products Company, and their associates or subsidiaries."

This allegation as to the nature of the combination, contract, or conspiracy is followed in each count with an allegation that defendants, in furtherance thereof, committed various acts of unfair competition. The declaration concludes with a general allegation that, as a result of the combination, contract, and conspiracy, plaintiff has sustained damage to the amount of $750,000, and asks for triple damages under the statute. Plaintiff does not contend, however, that it has shown the full amount of damages alleged, but does contend that it has shown damages to the amount of $207,292.08, in which is included estimated loss of profits of $137,490.-78 on a government flare light contract, alleged to have been diverted, estimated loss of profits of $26,103 on a government contract to erect an acetylene generating plant, known as the "advance base" contract, also alleged to have been diverted, estimated loss of profits of $37,525.56 on sales to the government of cutting and welding apparatus, alleged to have been prevented, and the sum of $6,172.-74, alleged to have been spent in advertising and in establishing agencies to compete for railroad business.

We have carefully reviewed the nearly 2,000 pages of printed testimony in the record, and have considered the arguments advanced in the approximately 900 pages of briefs, and are thoroughly convinced that the learned District Judge was correct in directing a verdict for the defendants. Without reviewing the testimony in detail, which would prolong this opinion beyond all reasonable lengths, it is sufficient to say that plaintiff has failed to prove the alleged contract, combination, or conspiracy in restraint of trade, and that, even if the conspiracy be assumed, plaintiff has failed to show that any item of the damages claimed by it has resulted therefrom. In no aspect of the case, therefore, is plaintiff entitled to recover anything.

[1] In passing upon the sufficiency of the proof to establish the contract, combination, or conspiracy in restraint of trade, the first question which confronts us is one as to the scope of the allegations of the declaration. Defendants contend that to recover plaintiff must establish the conspiracy to divide railroad and government business as set forth in subparagraphs (a) and (b), quoted above; whereas plaintiff contends that, even if it has failed to prove a conspiracy within the allegations of these subparagraphs, it can recover under the general allegations. It is very doubtful whether, without the subparagraphs, the declaration could be held a sufficient statement of a cause of action to constitute the basis of a recovery; for it is not sufficient that the declaration be framed in the words of the statute, or that it allege mere conclusions of the pleader. It must describe with definiteness and certainty the combination or conspiracy relied on, as well as the acts done which resulted in damage to plaintiff, and, in doing so, must set forth the substance of the agreement in restraint of trade, or the plan or scheme of the conspiracy, or the facts constituting the attempt to monopolize. 19 R. C. L. 87; Cilley v. United Shoe Mach. Co. (C. C.) 152 F. 726; Rice v. Standard Oil Co. (C. C.) 134 F. 464. It is not necessary, however, that we decide this question; for, in our view of the case, plaintiff has not only failed to prove the allegations of the subparagraphs, but has also failed to show any sort of unlawful combination or conspiracy in restraint of trade on the part of the defendants.

Addressing ourselves first to the allegations of the subparagraphs, we find no evidence to support these allegations, and the

evidence introduced by plaintiff itself seems to us to disprove them. The evidence relied upon is circumstantial, and consists of such circumstances as the large amount of railroad business done by the Oxweld Railroad Service Company in comparison with that done by the Davis-Bournonville Company, the large amount of government business done by the Davis-Bournonville Company in comparison with that done by the Carbide group of companies, payments made to the Davis-Bournonville Company by the Union Carbide Company and the Linde Air Products Company, financial assistance rendered the Davis-Bournonville Company by the Union Carbide Company, and various statements made by officials and employees of the Carbide group and the Davis-Bournonville Company as to their efforts to obtain government and railroad business. Some of these circumstances, standing alone and unexplained, might lend support to plaintiff's contention; but they must be taken in connection with other circumstances developed by the evidence, which fully explain them and negative the existence of any such combination, conspiracy, or agreement as is alleged. The learned trial judge arrayed and analyzed these circumstances in an able opinion filed by him in the District Court, and it is not necessary that we cover in detail the ground covered by him in that opinion.

[2] There can be no doubt that the Davis-Bournonville Company did little business with the railroads as compared with the business done by the Oxweld Railroad Service Company, or that the Carbide group did little business with the government as compared with the Davis-Bournonville Company; but it is clearly established that these disparities are properly attributable, not to agreement, combination, or conspiracy between the companies, but to the different methods of doing business pursued by them, and to certain natural advantages which they enjoyed over each other.. The Oxweld Railroad Service Company had developed a plan by which it furnished a complete oxyacetylene cutting and welding service to the railroads. Under this plan it did not sell the apparatus to them, but furnished it under a service contract with skilled instructors to supervise its use. This service contract was entered into in connection with affiliated companies of the Carbide group, who contracted to furnish calcium carbide, acetylene gas, and oxygen, and the Oxweld Railroad Service Company was compensated for the service which it rendered, and for the use of its apparatus, from the charge made for these commodities. It appears that the successful use of oxyacetylene cutting and welding apparatus by railroads depends upon their being assured an adequate supply of acetylene gas and oxygen, and upon their obtaining skilled operatives to use the apparatus. The service of the Oxweld Railroad Service Company, therefore, made a powerful appeal to them; for it provided skilled supervision of the cutting and welding operations and guaranteed an adequate supply of the necessary gases.

When this is remembered, it requires no theory of conspiracy to explain the fact that this service was soon adopted by a large number of the railroads, and that manufacturers, who merely sold the apparatus and did not furnish the service or supply the gases, found themselves outstripped in the competition with the company which did. On the other hand, apparatus manufactured by the Davis-Bournonville Company had been adopted as standard for use in the Navy some time before this country entered the war and when its demands for such apparatus were comparatively negligible. It appears, further, that the Davis-Bournonville apparatus, which, according to some of the evidence, was considered the best, was standardized for Army use early in the summer of 1917, under an emergency order and without competition or notice to other manufacturers. It is easy to understand, therefore, that the Davis-Bournonville Company had a lead over all competitors in the business of supplying the requirements of the government, and it is not necessary to resort to the theory of conspiracy to explain it.

But, although the Davis-Bournonville Company was outclassed by the Oxweld Railroad Service Company in competition for railroad business, and although the Oxweld Acetylene Company labored under a great disadvantage in competing with the Davis-Bournonville Company for government business, we think that the evidence conclusively shows that neither company ceased to engage in active competition in both fields of business. Sales to railroads by the Davis-Bournonville Company grew from $13,162.97 in 1913, when the conspiracy is alleged to have been formed, to $127,473.12 in 1920; and, although these figures are small in comparison with the government business done by the Davis-Bournonville Company in these years, they are inconsistent with the theory that the Davis-Bournonville group was retiring from the field of railroad business and leaving it to the Carbide group. On the other hand, the government business of the

Oxweld Acetylene Company grew from $3,-189.49 in 1914 to $143,928.06 in 1918, falling to $16,874.70 in 1920, the total for the period being $226,487.59, during which time the Oxweld Acetylene Company submitted 411 bids for government business, aggregating $1,223,613.54. This certainly is inconsistent with the theory that the Carbide group had relinquished the government field to the Davis-Bournonville Company. The evidence showed, moreover, efforts by the Davis-Bournonville Company to obtain a larger share of the railroad business, and strenuous efforts by the Oxweld Company to obtain a larger share of the government business. The latter company had its vice president and certain of its salesmen at Washington from time to time during the war, striving to get contracts. It protested when its bids were rejected in favor of the Davis-Bournonville Company, and sought to have its own apparatus declared standard for the use of the government. One of the items of damage which plaintiff claims is $26,103.00 for loss of profits on the government "advance base" contract, which was awarded to the Prest-O-Lite Company, a member of the Carbide group, over a bid by the Davis-Bournonville Company.

The fact that payments were made from time to time by the Union Carbide Company and the Linde Air Products Company to the Davis-Bournonville Company, that the Linde Air Products Company purchased the oxygen cylinders of the Davis Oxygen Company, a subsidiary of the Davis-Bournonville Company, when the former company retired from business in 1912, and that at one time the Union Carbide Company rendered financial assistance to the Davis-Bournonville Company by the purchase of a large block of its bonds, might, under some circumstances, be strong proof of combination between these companies; but we think that these facts have little or no probative value here. The evidence shows that it is only through the sale of apparatus that a market is created for calcium carbide, oxygen, or acetylene gas, and that for years it has been the custom of the Union Carbide Company to render financial assistance and to make payments in the nature of commissions or royalties to companies engaged in the sale of the apparatus which creates the market for its product. The evidence shows that the same policy has been followed by the Linde Air Products Company.

As to the purchase of the oxygen containers, and the retirement of the Davis Oxygen Company from business in 1912, the proof is that the Davis Oxygen Company merely retired from a business in which it had embarked to supply oxygen to purchasers of the Davis-Bournonville apparatus. When the Davis-Bournonville Company was able to procure oxygen for its customers elsewhere, there was no necessity for its continuing what the evidence shows it had found to be a losing venture. We see nothing in this which tends to show conspiracy to monopolize, or contract or combination in restraint of trade, and we think that plaintiff has failed to establish any contract, combination, or conspiracy in restraint of trade between the Davis-Bournonville Company and the other defendants, whether plaintiff be limited to the conspiracy to divide government and railroad business embraced in the subparagraphs or be allowed to proceed under the general allegations of the declaration.

[3] We think, also, that, if the Davis-Bournonville Company be eliminated from the case, plaintiff has failed to prove a combination or conspiracy in restraint of trade on the part of the other defendants. Of course, plaintiff has shown a combination existing on the part of these defendants; but it has not shown a combination in restraint of trade. Their business, as disclosed by the evidence, is not competing, but complementary. The Union Carbide Company is the manufacturer of calcium carbide, from which acetylene gas is made. Its product is sold by the Union Carbide Sales Company. Acetylene gas is desired by many customers, who do not care to generate it themselves from the carbide, and, to supply their needs, the Prest-O-Lite Company manufactures the gas and sells it compressed in cylinders. In the oxyacetylene cutting and welding industry, oxygen gas is needed for use with acetylene, and to supply this need the Linde Air Products Company compresses oxygen and sells it in cylinders. Before oxygen and acetylene gas can be used in cutting and welding, appropriate apparatus must be provided, and the Oxweld Acetylene Company manufactures apparatus of this character and sells it to the trade. The Oxweld Railroad Service Company, as shown above, provides a cutting and welding service for railroads, using the products of its associated companies, and being compensated for the service on the basis of the amount of such products used.

It is apparent that there is no competition between the products of these companies, and, as there is no competition between their products, the unity of control secured by the stock ownership of the Union Carbide & Carbon Corporation can-

not be said to stifle competition between the companies themselves. The combination results, not in suppression of competition, but in greater efficiency on the part of the constituent companies, and although, as pointed out by plaintiff, this unified control results in bringing large resources under one management, mere size does not constitute a violation of the act. U. S. v. U. S. Steel Corporation, 251 U. S. 417, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121. Nor is it violated merely by reason of the fact that there is brought under one control companies engaged in noncompeting branches of the industry.

As was said by Mr. Justice Holmes in U. S. v. Winslow, 227 U. S. 217, 218, 33 S. Ct. 255 (57 L. Ed. 481): "We can see no greater objection to one corporation manufacturing 70 per cent. of three noncompeting groups of patented machines collectively used for making a single product than to three corporations making the same proportion of one group each. The disintegration aimed at by the statute does not extend to reducing all manufacture to isolated units of the lowest degree. It is as lawful for one corporation to make every part of a steam engine and to put the machine together as it would be for one to make the boilers and another to make the wheels."

In the later case of U. S. v. United Shoe Mach. Co., 247 U. S. 45, 38 S. Ct. 478 (62 L. Ed. 968), the rule was stated as follows: "The combination was not unlawful so far as it did no more than put the different groups of noncompeting patented machines into one control. * * * It was not unlawful unless, to an extent injurious to the public interest, it destroyed competition."

We find no evidence of any combination between members of the Carbide group which would justify the conclusion that they were seeking to eliminate competition. When the control of the Linde Company was acquired, its cutting and welding apparatus business was transferred to the Oxweld Acetylene Company; but this did not eliminate competition, for, until that time, the Oxweld Company had not been manufacturing cutting and welding apparatus, but house-lighting apparatus. When the Prest-O-Lite Company was acquired by the Carbide group, it was manufacturing a cutting and welding torch of a different type from that manufactured by the Oxweld Acetylene Company, and this branch of its business was transferred to the Oxweld, and the Prest-O-Lite Company thereafter confined itself to the manufacture, compression, and sale of acetylene gas; but there is no evidence that this transfer resulted or tended to result in monopolization of the cutting and welding apparatus business by the Oxweld, or in any unreasonable restraint of trade, or in suppression of competition injurious to the public interest.

There was much evidence offered to show various acts of unfair competition by certain of the defendant companies, but there is nothing in any of it which tended to prove a contract, combination, or conspiracy in restraint of trade. If believed, it showed ruthless and unscrupulous individual competition, not co-operation in furtherance of a combination or conspiracy, and could not justify a recovery under the allegations in this case.

[4] But, as stated above, even if the conspiracy be assumed to have been proven, plaintiff must fail in this action, because it has offered no evidence whatever that the conspiracy caused or even contributed to the losses which it claims to have sustained. To recover triple damages under the statute, it is not sufficient for plaintiff to show damage resulting from a wrongful act of one of the parties to the conspiracy. Plaintiff must go further, and show that the wrongful act was one done in furtherance of or in the carrying out of the conspiracy. It is only where one is injured in his business or property by something forbidden or declared to be unlawful by the act that he may sue for damages thereunder. 26 Stat. 210 (Comp. St. § 8829).

As said by the Circuit Court of Appeals of the Eighth Circuit (Jack v. Armour & Co., 291 F. 745), "On both reason and authority, no one can maintain an action under the provisions of section 7 of the Sherman Anti-Trust Act, unless he has suffered an injury in his business or property by proximate reason of the violation, by the defendant or defendants whom he sues, of some of the prohibitions contained in that act." An agreement between two corporations engaged in interstate commerce, dividing out the territory of the country for their trade operations, would unquestionably be an agreement in restraint of trade in violation of the act; but a competitor of one of the companies would not have an action against it because the other company had withdrawn from the trade territory. Such withdrawal could not conceivably be the cause of damage to other competitors remaining in the field. For like reason, a wrongful act of the company remaining in the field, not growing out of the agreement, could not give rise to an

action against the company which had withdrawn.

[5] Applying these principles to the damages claimed, it is perfectly clear that plaintiff is not entitled to recover. The largest item of damage claimed is the sum of $137,490.28, alleged loss of profit due to diversion of a government flare light contract. Plaintiff's contention with respect to this is that in September, 1917, it was verbally awarded a contract for 9,000 flare lights by the War Department, but that, by reason of improper influences brought to bear upon certain government officials, this award was withdrawn, and plaintiff was given a contract for only 4,800 lights; contract being given for 4,800 to the Davis-Bournonville Company and for 2,000 to the Carbic Company, a corporation not connected with any of the defendants. Even if it be assumed that the evidence offered would justify the inference that the Davis-Bournonville Company improperly influenced the official charged with awarding this contract, there is absolutely nothing to show that this was an act done in the carrying out of the combination or conspiracy charged, or that the other defendants had anything to do with it. The same observation applies to the items amounting to $37,525.56 for loss of profits on contracts for cutting and welding apparatus awarded the Davis-Bournonville Company.

The item of $26,103 is for loss of profits on the "advance base" contract awarded to the Prest-O-Lite Company, a member of the Carbide group. Plaintiff claims that it lost this contract because of false representations made concerning its financial responsibility by an official of the Prest-O-Lite Company; but there is nothing to show that these false representations were made in furtherance of the conspiracy charged, and we do not see how false representations made by a member of the Carbide group to secure the contract for itself could be said to be in furtherance of a conspiracy which provided that government business should be allotted to the Davis-Bournonville Company.

The remaining items of damage, aggregating $6,172.74, represent expenditures made by plaintiff in competing for railroad business; but, as plaintiff admitted in the court below that it could not show that it had lost any railroad business as a result of the alleged conspiracy, these items must go out of the case also. Plaintiff cannot recover the cost of competing for business which it admits that it cannot show that it lost. In no aspect of the case, therefore, is plaintiff entitled to recover anything, and the judgment of the District Court is accordingly affirmed.

Affirmed.