MILLER MOTORS, Inc., Appellant,

v.

FORD MOTOR COMPANY, a Corporation, Appellee.

No. 7487.

United States Court of Appeals Fourth Circuit.

Argued Oct. 23, 1957.

Decided Jan. 20, 1958.

H. Bryce Parker, Winston-Salem, N. C., for appellant.

W. P. Sandridge and W. F. Womble, Winston-Salem, N. C. (Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., on brief), for appellee.

Before SOPER, SOBELOFF, and HAYNSWORTH, Circuit Judges.

SOBELOFF, Circuit Judge.

A former dealer in Lincoln and Mercury automobiles, Miller Motors, Inc., of Winston-Salem, North Carolina, brought this action in the United States District Court for the Middle District of North Carolina against the manufacturer, Ford Motor Company, alleging six separate causes of action for violation of the anti-trust laws and seeking treble damages for injuries resulting therefrom.

Defeated in each of its several claims, the plaintiff took this appeal. It now expresses dissatisfaction with only two of the adverse dispositions below, contending that the District Judge, who sat without a jury, erred in failing to hold the defendant guilty of violating Section 1 of the Sherman Act (15 U.S.C.A. Sec. 1), which makes illegal conspiracies in restraint of trade, and also Section 3 of the Clayton Act (15 U.S.C.A. Sec. 14), which condemns, among other things, "tie-in sales" that tend substantially to lessen competition.

In the District Court, the evidence and the contentions of the parties took a wide range; but as the scope of the case has been greatly narrowed on appeal, by the abandonment of many of the controversies between the parties, a host of intricate facts recited in detail in the District Judge's opinion (Miller Motors, Inc. v. Ford Motor Co., 1957, 149 F.Supp. 790) need not be repeated here. We are not concerned on this appeal with the plaintiff's claim for damages asserted in the District Court for the termination of its dealership, as the plaintiff now concedes that it is not entitled to recover on this cause of action; nor are we called upon to adjudicate other alleged wrongful practices of the defendant, committed during the life of the dealership. However, certain evidence adduced in support of these claims is still relied on in connection with the two surviving claims. This evidence we have considered, but we shall set forth only so much as is necessary to deal with the issues remaining.

### Sherman Act Violation

We turn first to the appellant's contention that the defendant, Ford Motor Company, entered into a conspiracy in restraint of trade or commerce in the sale of automobiles and advertising in violation of Section 1 of the Sherman Anti-trust Act.

A bit of history is necessary at this point. In October 1946, the Ford Company established a separate Lincoln-Mercury Division, and the Lincoln-Mercury dealers elected representatives from each of the six Lincoln-Mercury sales regions to meet in Detroit. These dealers were unanimous in their desire to form advertising funds similar to but distinct from Ford Dealers Advertising Funds, which had existed since 1934 and to which many Lincoln-Mercury dealers had belonged as dealers in either these makes of automobiles or Ford cars. Throughout the country, such Lincoln-Mercury Dealers Advertising Funds (LMDA's) were then created.

The precise role of the Ford Company in planning and creating these advertising funds is a point in dispute. The

plaintiff claims that the LMDA's were formed by the defendant as a scheme to exact from the dealers the cost of advertising its products. The conspiracy is said to have been entered into by Ford with the LMDA's, its alleged creatures. Ford denies the existence of any conspiracy, and the formation of the LMDA's is defended as a legitimate effort to carry out a uniform, effective, and economical system of advertising to promote sales in which both the manufacturer and its distributors were interested.

It is not to be doubted that Ford encouraged and aided the organization of the LMDA's all over the country, including the Jacksonville LMDA, to which the plaintiff belonged. It is undisputed that a representative of the Ford Company opened the first meeting of the J-LMDA on April 18, 1947, and Ford representatives, pursuant to a standing invitation, attended most of its meetings. The Court below determined as a fact that the Ford representatives were present mainly as a source of information regarding factory plans, new developments, production schedules, etc. J-LMDA was organized as a non-profit Florida corporation, and six dealers were elected as its directors. The District Judge found that the dealers elected to administer the fund were nominated from the floor and that no slate of nominees was prepared by anyone in advance.

The pre-existing local Ford Dealers Advertising Fund made an accounting and turned over to J-LMDA the money which it had collected on Lincolns and Mercuries before dealers in those cars were organized separately from Ford car dealers. The Judge found that each LMDA was free to select its own advertising counsel, but all of the LMDA's chose the firm of Kenyon and Eckhardt because it was doing the L-M institutional advertising. The Court below noted that there is no corporate interrelationship between Ford and Kenyon and Eckhardt.

In the LMDA agreements, the directors of the local LMDA were authorized to fix the amount of, and method of collecting, contributions to the advertising fund. At the request of J-LMDA, dealer assessments were included in the price of new automobiles delivered to the dealers, and upon collection were turned over by Ford to the treasurer of the J-LMDA. The assessments made were on the basis of the number of Lincolns and Mercuries sold by a particular dealer, and the amount per car varied among the approximately twenty LMDA's and, from time to time, within the separate LMDA's. Generally, the J-LMDA assessments were from five dollars to sixty dollars on Lincolns, and from ten dollars to forty-five dollars on Mercuries.

Based upon estimated L-M sales, advertising would be planned in advance by Kenyon and Eckhardt on a quarterly basis. Twenty-five or thirty proposed newspaper advertisements would be prepared by Kenyon and Eckhardt, and, after their approval by Ford's advertising department, the J-LMDA committee would pick several from this number. J-LMDA often advertised used cars, and copy therefor was also prepared by Kenyon and Eckhardt. There was also radio, billboard, movie, and direct mail advertising, prepared by Kenyon and Eckhardt, but arranged independently by J-LMDA in some instances.

Judge Thomsen found that J-LMDA did not always follow Kenyon and Eckhardt's recommendations, and that it frequently made changes in the copy submitted by Kenyon and Eckhardt, occasionally even departing from the basic theme which usually ran through the advertising of Lincolns and Mercuries.

When a radio or newspaper advertisement was placed, the local dealer was informed of it, and he could, and occasionally did, have it changed to his own satisfaction. In fact, the Court found that Mr. Jack Miller, son of the plaintiff corporation's president, and himself an employee of Miller Motors, made selections of radio spot announcements sent to the local radio station by Kenyon and Eckhardt. In areas where radio or newspaper coverage was slight, so that such advertising would be ineffective, advertis-

ing through other media, such as billboards, was increased to insure to each dealer an aliquot return on his subscription.

Though Kenyon and Eckhardt prepared "blitz" advertising (emphasizing that a large number of automobiles must be sold in a short time at reduced profits), those dealers who preferred the more conventional approach (and more ample margins of profit) were permitted to advertise accordingly. It is noteworthy that when the idea of "blitz" advertising was first presented to J-LMDA, K. M. Matthews, its chairman, spoke for forty minutes against its use. But, as the trial judge found, other dealers liked it, and Matthews followed the majority decision.

When the Ed Sullivan television show began in 1949, several Atlanta dealers, members of the J-LMDA, wanted to participate in its sponsorship. Only the Atlanta dealers, however, paid for it out of their share of J-LMDA advertising, and if a majority of the dealers in the vicinity of another television station desired the Ed Sullivan show to be carried by their local station, the chairman of the J-LMDA would arrange it.

Records were kept, first by J-LMDA and later by Kenyon and Eckhardt, from which it could be determined whether each dealer received his aliquot share of LMDA advertising. If dealers sought an accounting, which they seldom did, they were furnished it. In addition, the J-LMDA committee mailed to each of its dealers a report of the monthly meetings.

Thus it is seen that a considerable measure of autonomy was exercised by the dealers in the administration of the funds created by their contributions.

The District Judge found as a fact that in effect, dealer participation in the LMDA's was compulsory, for it was known among dealers that Ford policy was that they should become members of LMDA's. As each new dealer signed an original sales agreement, he was presented with an LMDA agreement. Only four Lincoln-Mercury dealers in the United States have not been members of some LMDA since 1950. The testimony showed that Ford representatives made it unmistakably clear that a dealer's franchise would be terminated if he resigned from LMDA.

As the Court below noted, however, it would have been difficult for Ford to surmount any general and concerted opposition to LMDA by the L-M dealers. A basis for this observation is found in the fact that, at a J-LMDA meeting at Sea Island, Georgia, on September 11, 1954, a resolution was passed requesting the defendant to absorb more advertising costs and to allow more funds to be available for expenditure by the LMDA committee. If this could not be done, the committee recommended that "all assessments be discontinued" and J-LMDA "be dissolved." On October 12, 1954, the defendant announced that it had agreed to finance approximately half of the Ed Sullivan show for 1955. It appears, also, that in general, the dealers recognized that they derived substantial benefit from the arrangement. On the other hand the Court also found that dealer pressure required Ford to insist that "an occasional recalcitrant dealer" continue his membership in LMDA or lose his franchise. [149 F. Supp. 802.]

In the three years before suit was filed, plaintiff paid to LMDA a total of $8,330.-00 and engaged in its own independent advertising at an expense of $34,500.00.

Plaintiff calls attention to an excerpt from a J-LMDA minute book, reciting that on June 21, 1950, when a $1,000,-000.00 memorial was being built to honor Henry and Edsel Ford, the J-LMDA committee passed a resolution tentatively approving the appropriation of its share, $12,948.00, but deciding further that a letter should be written to each dealer in the district, giving all the dealers an opportunity to object. The resolution provided that unless a majority of dissenting votes was received by July 15, approval of the dealers would be assumed and the Secretary would be authorized to make a check to the Ford Memorial Fund. The plaintiff has gone no further than apprising us of this resolution, however,

and does not claim that either the plaintiff or a majority of the dealers voiced their disapproval.

It is noteworthy that plaintiff received, in the four years prior to suit, $716.37 more in LMDA advertising than it paid for.

With great earnestness, the plaintiff urges on appeal, as it did below, the case of United States v. General Motors Corp., 7 Cir., 1941, 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, as authority for its contention that we must hold, as did the 7th Circuit there, that the manufacturer is in violation of the antitrust laws.

Relying upon the finding in that case, that a conspiracy existed between General Motors Corporation and General Motors Acceptance Corporation, the appellant contends that the record here calls for us to find a much closer relationship between the Ford Company and the LMDA's than the District Court found. We shall discuss the evidence, but it is in order to note preliminarily that the plaintiff's argument loses much of its force when it is considered that in the General Motors case, the Court of Appeals merely affirmed, as supported by the evidence, a finding below that a conspiracy existed, while in this case we are asked to upset a contrary finding which is likewise supported by evidence. This we may not do unless we are convinced that the District Judge's findings are clearly erroneous. Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.

█ Even if we accept plaintiff's argument that LMDA's are a creation of the Ford Motor Company, organized solely to raise advertising funds for its products, the action would nevertheless fail. It is not sufficient for the plaintiff to prove a co-operative effort between Ford and LMDA, but it must be shown that the combination has the objectionable features which the act is designed to prevent. Alexander Milburn Co. v. Union Carbide & Carbon Corp., 4 Cir., 1926, 15 F.2d 678, 682.

The plaintiff maintains that the added cost of LMDA advertising has increased the price of Lincoln and Mercury cars, and that "prospective buyers of defendant's automobiles would refuse to buy same at a higher price tag." This case, therefore, according to the appellant's argument, is analogous to the General Motors case, where it was said that the requirement that dealers use GMAC financing, with its mandatory provisions for higher down payments than those required by competitors, and other features of the GMAC contracts, placed General Motors automobiles beyond the reach or desire of prospective purchasers.

█ This brings us to the essential difference between the situations found here and in the General Motors case. It is true that in both the price to the consumer is indirectly affected, and this has an influence on trade or commerce. However, despite the sweeping and seemingly all-inclusive language of the Sherman Act, it has long been settled that only those arrangements which *unduly* or *unreasonably* restrain commerce are forbidden. Standard Oil Co. v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. See also: Oppenheim, "Federal Antitrust Legislation: Guideposts to a Revised National Antitrust Policy," 50 Mich.L.Rev. 1139. It is enough that here substantial advantages inured to the dealers through the device of a single advertising program; that, as the Court below found, the LMDA's enjoyed almost complete autonomy as to their choice of advertising counsel, media, and copy; and that the restraint imposed by higher costs of products through advertising is only an incidental one, the recognized purpose and usual effect of advertising being the increase of trade and not its restraint. It is not shown that Ford had any interest in the Kenyon and Eckhardt advertising agency except to obtain effective advertising service from it. Ford was not using its economic position as an automobile manufacturer to invade and dominate the advertising business.

In the General Motors case, to the contrary, it was shown that the defendant, reaching out to monopolize the business of financing the resale of automobiles of its manufacture, formed a conspiracy unreasonably to interfere with commerce. The court declared that the mandatory scheme to impose the financing of automobile sales through a concern which it wholly owned, and whose profits it enjoyed, was unreasonable and bore no relation to the good will of General Motors or its line of cars. It characterized the defendant's claim that the plan was designed to stimulate sales, as so farfetched that "it would have been surprising had the jurors accepted it." United States v. General Motors Corporation, 7 Cir., 1941, 121 F.2d 376, 412. This is sufficient to point up the contrast between the two cases.

It is pertinent to observe that beyond the $8,330.00 contributed to the fund by the plaintiff and expended in its entirety in plaintiff's territory in a manner not disapproved by it, plaintiff expended for advertising during the period in question the additional sum of $34,500.00 of its own money. It is incredible, upon any theory, that the larger expenditure, which was unquestionably voluntary, was justified by business considerations, but that the much smaller sum was of no advantage to the plaintiff, a barren performance that merely increased the cost of the product it was handling. Nor is it perceived how the plaintiff can carry the burden of showing that the LMDA advertising cost restrained trade in automobiles, while the much larger sum it devoted independently to the same purpose promoted this trade.

■ The combined weight of these considerations, clearly developed in the testimony and in Judge Thomsen's findings, removes the LMDA advertising program from the sphere of arrangements forbidden by the statute.

As to the complaint that there was restraint of trade or commerce in advertising, as distinguished from commerce in automobiles, we think this is not the real grievance of the plaintiff, and as the District Judge found, the complaint is in any event not sustained. We agree that merely selecting a single agency, to gain the advantage of co-ordinated advertising, did not in the circumstances restrain commerce in advertising. Neither such result nor the tendency is established in the testimony. The plaintiff merely showed the plan for co-ordinated advertising, levelled his charge of conspiracy to work a restraint of the advertising business, and rested. The conclusion it wished the court to draw is not attainable on this record. Except for the feature that participation was expected and encouraged by the defendant, with the general support of dealers, the LMDA plan differs little from any other cooperative advertising plan, which, in the words of Mr. Justice (later Chief Justice) Stone, is "admittedly beneficial to the industry and to consumers * * *." Maple Flooring Mfrs. Ass'n v. U. S., 1925, 268 U.S. 563, 566, 45 S.Ct. 578, 579, 69 L.Ed. 1093.

■ Therefore, there being no showing of any public injury resulting from a restraint of commerce in automobiles or advertising, it cannot be said that the Sherman Act has been violated. See: Arthur v. Kraft-Phenix Cheese Corp., D.C.Md.1937, 26 F.Supp. 824, 825; Alexander Milburn Co. v. Union Carbide & Carbon Corp., 4 Cir., 1926, 15 F.2d 678, 682; Lawson v. Woodmere, 4 Cir., 1954, 217 F.2d 148, 151; Schwing Motor Co. v. Hudson Sales Corporation, D.C.Md.1956, 138 F.Supp. 899, 903, affirmed and opinion adopted by the Court of Appeals as its own, 4 Cir., 1956, 239 F.2d 176. See also, Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, and cf. Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Appalachian Coals, Inc., v. United States, 1933, 288 U.S. 344, 53 S.Ct. 471, 77 L. Ed. 825.

■ The failure to prove either a conspiracy or an unreasonable restraint of trade results in failure of the cause of action founded on Section 1; but it may be mentioned parenthetically that there

are other infirmities in this branch of the plaintiff's case. The hybrid nature of a private antitrust suit dictates that, to succeed, the plaintiff must prove not only that the defendant has infringed one or more of the antitrust laws to the public injury, but also that such infringement has resulted in private injury to the plaintiff in its business or property. 15 U.S.C.A. Sec. 15. In the absence of a showing of either the public or the private harm, the plaintiff cannot prevail. See: Alexander Milburn Co. v. Union Carbide & Carbon Corp., 4 Cir., 1926, 15 F.2d 678; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 1934, 72 F.2d 885, 887; American Potato Dryers v. Peters, 4 Cir., 1950, 184 F.2d 165; Peller v. International Boxing Club, 7 Cir., 1955, 227 F.2d 593; "Antitrust Enforcement by Private Parties: Analysis of Developments in the Treble Damage Suit," 61 Yale L.J. (1952), 1010; "Treble Damages—Reward for Private Enforcement of Federal Anti-Trust Laws," 32 Dicta (1955), 293.

■ Even though Miller Motors received $716.37 more in LMDA advertising than it paid for, the plaintiff further argued that the cost of LMDA advertising is included in the sale price of Lincoln and Mercury automobiles, thereby creating a "higher price tag" for prospective buyers of defendant's automobiles. If this was the case, even if a conspiracy in violation of the Sherman Act existed, any increases in the price of defendant's product were passed on (together with a profit) to the ultimate consumer; and under the settled decisions, plaintiff has suffered no injury for which the law will permit him treble damages. "If appellants did not absorb such increase in price but passed it on to their customers, they could not recover in a treble damage action brought under the antitrust act." Wolfe v. National Lead Company, 9 Cir., 1955, 225 F.2d 427, 433, certiorari denied 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802; Northwestern Oil Co. v. Socony-Vacuum Oil Co., 7 Cir., 1943, 138 F.2d 967, 971, certiorari denied 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081; Clark Oil Co. v. Phillips Petroleum Co., D.C.Minn.1944, 56 F.Supp. 569, 572.

■ The plaintiff asserts, however, that because of the added LMDA assessments, fewer cars were sold; but this is purely conjectural in the absence of any analysis of market conditions from time to time. When it appears that the plaintiff's sales were below the national and district averages of Lincoln and Mercury dealers, it cannot be assumed that its failure resulted from the assigned cause. While it is true that in an antitrust case wide latitude is allowed in the proof of damages, the plaintiff here introduced no evidence from which an inference could fairly be drawn that its losses were the proximate result of the defendant's alleged violation. Cf. Bigelow v. R.K.O. Radio Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652. Indeed, there is more than a suggestion in the testimony that the plaintiff's losses resulted from its own lack of business aptitude rather than from any conspiracy in restraint of trade.

And so, for the additional reason that there has been no showing of private injury resulting to the plaintiff, the complaint based on Section 1 of the Sherman Act fails.

### Clayton Act Violation

■ In addition to automobiles, Ford sells a large volume of parts and accessories. Some are of Ford manufacture and some are merely Ford-approved, i. e., manufactured by others but sold by Ford after being approved by the Ford engineering group. While certain replacement parts, such as crankshafts, cylinder blocks, fenders, and doors, are not manufactured by others and are obtainable only from Ford, other items are available from outside sources, as well as from the defendant. Included in the latter group are such articles as undercoating, fuel pumps, batteries, spark plugs, ignition parts, seat covers, transmission gears, and fan belts. It is in respect to supplies sold by both Ford and independent unapproved manufacturers that the

plaintiff alleges that the defendant's practices violate Section 3 of the Clayton Act.

In support of its claim, the appellant stresses a provision in the Lincoln and Mercury sales agreements in which the dealer agrees "to maintain a stock of genuine Mercury parts and approved accessories of an assortment reasonably comparable to the current demand, equivalent to at least one-sixth ($\frac{1}{6}$) of the sales of parts and accessories by Dealer during the previous twelve (12) months based on cost to Dealer." This, the plaintiff maintains, is a "definite expressed provision that would require the plaintiff to buy from the defendant parts and accessories that would substantially reduce competition in the sale of parts and accessories."

At the trial below, the plaintiff conceded that the provision referred to was not an express agreement or understanding that plaintiff would not use or deal in the goods of competitors of Ford. Nevertheless, this contention is pressed by the plaintiff on appeal. As we think the provision is manifestly not an express agreement of this character, we pass at once to the question of whether there was, as Miller Motors further argues, an implied agreement not to deal in parts and accessories of competing suppliers, such implication arising, it is said, from Ford's dealings with the plaintiff with respect to "tie-in" sales of parts and accessories.[1]

The appellant notes that at the beginning of each model year, dealers would be presented by Ford with an "initial parts order," already filled out and requiring only their signatures for completion. These "initial orders" contained, in addition to items peculiar to or necessary for replacement on new models, such equipment as spark plugs, batteries, road lamps, and foot hassocks. The plaintiff argues that it was compelled to buy the items specified by the defendant in these "initial orders" and that additional orders were, at times, presented to dealers for signature after having been filled out by Ford representatives. Whatever Ford's practice in this regard may have been with respect to other dealers, however, Mr. Thomas W. Hauser, parts manager for the plaintiff from 1948 until the franchise was cancelled, testified explicitly that he would mark off certain items from prepared lists if he did not think the plaintiff could sell them or if he did not particularly want them.

The District Judge did find in the record evidence of pressure upon the plaintiff to buy the defendant's parts and accessories. He made a finding, as proposed by plaintiff, that the defendant's employees objected to the plaintiff's keeping parts of other suppliers in its storeroom. Ford representatives told J. H. Miller, president of the plaintiff corporation, that Miller Motors should sell a larger volume of parts per repair order, and also advised plaintiff to sell parts as a wholesaler to other automobile repairers. At one time, Joe Bayne, the Mercury Sales Manager, in a speech to the dealers of the Southern Region, said that purchases of parts and accessories from Ford were "franchise insurance." The defendant set sales quotas or objectives for the plaintiff which the plaintiff did not meet, and this failure was one of the reasons for the cancellation of its franchise. Finally, the Court found as a fact that "Ford insisted that plaintiff purchase and carry a volume of parts and accessories satisfactory to Ford as a condition of continuing as a franchise dealer."

It may be noted that the requirement that the dealer shall stock Ford parts "reasonably comparable to the current demand" is ambiguous, for the term may mean the current demand for all such parts, whether Ford-manufactured or approved, or otherwise, or it may mean the current demand for Ford or Ford-approved parts only. If it means the former, then the formula of one-sixth may raise serious antitrust questions, if the record should show an attempt

[1]. For an excellent and timely discussion of the general subject of "exclusive dealing," see Chap. II of Prof. Milton Handler's "Antitrust in Perspective" (1957).

thereby to compel the dealer to overstock on Ford-manufactured or Ford-approved parts, consequently interfering with his ability to stock rival replacement products and restricting freedom of choice by automobile owners. See: Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653; United Shoe Mach. Co. v. United States, 1922, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; International Business Machines Corp. v. U. S., 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Fashion Originators Guild v. Federal Trade Comm., 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; International Salt Co. v. U. S., 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Standard Oil Co. v. United States, 1948, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371; Times Picayune v. U. S., 1953, 345 U.S. 594, 606–608, 73 S.Ct. 872, 97 L.Ed. 1277.

In the years 1952 through 1954, plaintiff bought $83,404.56 worth of parts and accessories from Ford and $74,569.72 worth from others. The plaintiff's testimony was that three out of every seven automobiles repaired by it were other than Ford manufactured. From this the plaintiff argues that the proportion of Ford-manufactured parts purchased by it is thus shown to be disproportionately high, while the defendant sees in these figures opposite indications. Upon consideration of this and much other testimony, which we deem it unnecessary to repeat in detail, the Judge found as a fact that "Ford did not require plaintiff to purchase parts and accessories as a condition of Ford's acceptance of individual orders for the purchase of automobiles," and that "defendant never required plaintiff to purchase any given percentage of its parts and accessories from the defendant."

What is the legal significance of these findings? The conclusion which the plaintiff seeks to draw from the pressures so shown to have been applied against it by the defendant is that they amounted to an implied contract not to deal in the parts and accessories of the defendant's competitors, and that this contract tended substantially to lessen competition. In the view which the District Judge took, however, the pressures unquestionably applied against Miller Motors were legitimate under the circumstances and did not amount to an implied agreement not to deal in goods or commodities of other suppliers. The question raised by the challenge to this conclusion need not be answered because the Judge also found that "plaintiff has not shown that it sustained any damages in connection with parts and accessories as a result of anything done by Ford or its representatives" within a period of three years before the suit was filed. We have carefully scrutinized the record and conclude that the finding is well supported; and as it is dispositive of this branch of the case, we need not decide other debatable points.

■ This action having been initiated before the enactment of the uniform four-year statute of limitations for civil antitrust suits (which is not retroactive), 15 U.S.C.A. (1957 Supp.), Sec. 15b, the applicable North Carolina statute of limitations is determinative of the time beyond which the plaintiff may not claim injuries. Chattanooga Foundry & Pipe Works v. Atlanta, 1906, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241; Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir., 1942, 128 F.2d 645, 647. There was some question as to whether the one-year North Carolina limitation on actions upon a statute for a penalty (Gen.Stat.N.C. (1953), Sec. 1–54, subd. 2), or the three-year North Carolina limitation on actions upon a liability created by statute other than a penalty (Gen.Stat.N.C. (1953), Sec. 1–52, subd. 2) was appropriate. The trial judge found it unnecessary to decide the point, and since we likewise find no injury to the plaintiff within the longer, three-year period, we too have no occasion to decide whether that or the lesser statutory period applied. The result would be the same in either case.

We have examined the record as to each of the items claimed to have been bought by the plaintiff under Ford pressure, including obsolete parts, seat cov-

ers, batteries, spark plugs, foot hassocks, laprobes, and luggage, and we find that all of the allegedly injurious purchases occurred prior to July 29, 1952. Suit was instituted on July 29, 1955.

■■ There being no proof of compensable damage suffered by the plaintiff, the action for treble damages arising from the alleged violation of Section 3 of the Clayton Act must fail. "Report of the Attorney General's National Committee to Study the Antitrust Laws" (1955), p. 380; Suckow Borax Mines Consol. v. Borax Consolidated, 9 Cir., 1950, 185 F. 2d 196, certiorari denied 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680, rehearing denied 341 U.S. 912, 71 S.Ct. 620, 95 L.Ed. 1349. See: American Potato Dryers v. Peters, 4 Cir., 1950, 184 F.2d 165.

## Conclusion

In its initial stages, this suit included claims for damages for "market domination" and wrongful termination of the franchise agreement; much of the testi-

mony was directed to these aspects of the case. Congress in recent years has given consideration to alleged abuses in manufacturer-dealer relationships in the automobile industry, and a measure of reform was attempted by the enactment in 1956 of the O'Mahoney "Automobile Dealer's Day in Court" Statute, 15 U.S.C.A. (1957 Supp.), Sec. 1221 et seq.[2] Phases with which this legislation deals have been withdrawn from the case by the plaintiff itself, and even if the statute had retroactive effect, its applicability to the remaining causes of action is doubtful. Even without the aid of such legislation, the old law provides remedies upon proof of certain violations. Much of the plaintiff's evidence was calculated to show a general atmosphere of dissatisfaction in the industry arising from asserted maltreatment of dealers by the inequitable and oppressive use of the manufacturer's superior economic power. See: Ford Motor Co. v. Kirkmyer Motor Co., 4 Cir., 1933, 65 F.2d 1001. Courts are restrict-

2. In March, 1955, the most extensive study of the automobile industry ever conducted by Congress was begun by a subcommittee of the Senate Committee on Interstate and Foreign Commerce. After nine months of background study, hearings began on January 19, 1956, and ran until June 21, 1956. See: Hearings, Before the Subcommittee on Automobile Marketing Practices, The Committee on Interstate and Foreign Commerce, United States Senate, 84th Cong., 2nd Sess.; Senate Report No. 1879, "Bigness and Concentration of Economic Power—A Case Study of General Motors Corporation," 84th Cong., 2nd Sess. Out of these investigations first came "The Automobile Marketing 'Fair Play' Bill," S. 3946, 84th Cong., 2nd Sess., a bill which sought to outlaw (among other things) as unfair methods of competition and as unfair acts or practices in commerce, (1) the inducement by means of coercion, intimidation, or discrimination, of dealers to accept for delivery any product of any kind, and (2) cancellation of a dealer's franchise without his consent, unless the franchise agreement contained mutually agreed upon standards by reference to which the duties and obligations of the dealer might be determined. See: Senate Report No. 2791, 84th Cong., 2nd Sess. This proposed statute was to have be-

come part of the Federal Trade Commission Act and to have been enforced by the F.T.C. The bill passed the Senate at the end of the 84th Congress, but was never acted upon by the House of Representatives.

Enacted into law, however, was the less detailed "Automobile Dealer's Day in Court" act, which took effect on August 8, 1956, and which was sponsored by Senator Joseph C. O'Mahoney, of Wyoming. See: Senate Report No. 2073, 84th Cong., 2nd Sess. This statute permits a dealer to sue an automobile manufacturer for damages sustained by failure of the manufacturer to act in good faith in performing or complying with any of the terms or provisions of the dealer's franchise, or in terminating, cancelling, or not renewing the franchise with the dealer. The essential term, "good faith," is defined in the act as imposing upon each party to the franchise the duty "to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party"; the definition adds the further proviso, however, "That recommendation, endorsement, exposition, pursuasion, urging or argument shall not be deemed to constitute a lack of good faith," 15 U.S. C.A. (1957 Supp.), Sec. 1221 et seq.

452

ed, however, to legally recognized causes of action and to properly established facts to sustain them, and they do not award damages where the requisite proof has not been made. We lay down no broad rule for cases that may arise in individualized fact situations not now before us; we merely hold on this record that the evidence adduced does not sustain the theories upon which the action was brought.

It would be inappropriate for us to make pronouncements upon the many interesting and important questions of antitrust law suggested by the parties. These need not be considered in the circumstances revealed here, and answers can be deferred until they are called for in an adequate record.

We find no error in the judgment of the District Court and it is, therefore,

Affirmed.